Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 7, 2003    Decided December 23, 2003

No. 02-1189

JACQUELINE ORLOFF,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

NEW PAR AND
VERIZON WIRELESS,
INTERVENORS

———

On Petition for Review of an Order of the
Federal Communications Commission

———

*Randy J. Hart* argued the cause for petitioner. With him on the briefs was *Mark D. Griffin*.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Richard K. Welch*, Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Robert B. Nicholson* and *Steven J. Mintz*, Attorneys, U.S. Department of Justice, *Jane E. Mago*, General Counsel, Federal Communications Commission, and *John E. Ingle*, Deputy Associate General Counsel. *Daniel M. Armstrong*, Associate General Counsel, entered an appearance.

*Kathleen M. Trafford* argued the cause for intervenors. With her on the brief were *Daniel W. Costello* and *Kenneth D. Patrich*.

Before: SENTELLE, RANDOLPH, and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: In order to gain new business in the Cleveland, Ohio, area, Verizon Wireless negotiated with prospective customers and offered them special deals. Jacqueline Orloff, a former Verizon customer, filed a complaint with the Federal Communications Commission, claiming that Verizon's practice of granting "sales concessions" violated the non-discrimination clause of 47 U.S.C. § 202(a) and Verizon's duty as a common carrier. Her petition for judicial review challenges the Commission's determination that Verizon's granting of sales concessions was a reasonable response to competitive conditions in the Cleveland market, not "unjust or unreasonable" discrimination in violation of § 202(a).

## I.

Verizon Wireless provided service to Orloff from February 1999 until February 2001. The Commission found that during this period, the Cleveland-area mobile phone market was highly competitive. Five facilities-based providers and numerous resellers vied for business. The providers — none of whom had market power — offered an assortment of plans, which they promoted with advertising and special offers.

Like its competitors, Verizon had several standard rate plans and regularly engaged in special advertising promotions, offering airtime minutes or additional services at no extra charge. Verizon also authorized its salespeople to give

concessions to potential customers if needed to "close the deal." These concessions might include free minutes, a free feature like voice mail or call forwarding, a discounted cell phone, or a one-time monetary credit. Verizon did not advertise the availability of sales concessions (or of "retention concessions" for existing customers, which Orloff no longer challenges). The concessions were offered at the salesperson's discretion to prospective customers who negotiated — haggled — for a better deal.

In February 1999, Orloff — who lives in the Cleveland area — agreed to a two-year mobile phone contract with Verizon. She purchased an advertised plan and received several concessions: a discounted phone, free activation, three months of free weekend use, and a credit worth half her monthly fee for six months. Five months into the two-year contract, Verizon agreed to allow Orloff to switch to another plan, at which time Verizon gave her a billing credit as a retention concession.

In February 2000, Orloff and three others sued Verizon in the United States District Court for the Northern District of Ohio. The suit was a putative class action on behalf of at least 50,000 Ohio residents who bought Verizon mobile phone service in the previous two years. The complaint alleged that Verizon, in giving sales concessions, treated similarly situated customers differently, in violation of § 202(a) of the Communications Act. The district court referred "the matter" to the Commission and stayed further proceedings, although the court did not specify which issues it thought were within the Commission's primary jurisdiction. *Orloff v. Vodafone Airtouch Licenses LLC*, Case No. 1:00 CV 421 (N.D. Ohio May 30, 2000).

To implement the court's order, Orloff filed a complaint with the Commission under § 208 of the Act. (The complaint was on behalf of Orloff alone, not the class identified in the district court.) The Commission ruled that in a market as competitive as Cleveland's, market forces protected consumers from unreasonable discrimination. *See Orloff v. Vodafone AirTouch Licenses LLC d/b/a Verizon Wireless*, 17 F.C.C.R.

8987, 8996 (2002). Dissatisfied customers could switch providers, and it was "unlikely that a carrier would have an incentive to engage in unreasonable discrimination where such conduct would result in a loss of customers." *Id.* at 8996–97. The Commission therefore decided that although, in terms of charges and services, Verizon treated Orloff differently than some other similarly situated customers, Verizon did not engage in unjust or unreasonable discrimination in violation of § 202(a). *Id.* at 8995. Orloff also claimed that Verizon's practice violated the command of § 201 that all "charges, practices, classifications, and regulations" of communications common carriers be "just and reasonable." The Commission held that if a practice is just and reasonable under § 202, it must also be just and reasonable under § 201. *Id.* at 8999.

## II.

Congress modeled the Communications Act of 1934 on the Interstate Commerce Act, the "great purpose" of which "was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination." *New York, New Haven & Hartford R.R. v. ICC*, 200 U.S. 361, 391 (1906). The "centerpiece" of Title II of the Communications Act was the requirement, set forth in § 203, that communications common carriers file their rates with the Commission and charge customers only those rates. *MCI Telecomm. Corp. v. AT&T*, 512 U.S. 218, 220 (1994). As in the Interstate Commerce Act, "rate filing was Congress's chosen means of preventing unreasonableness and discrimination in charges" by common carriers. *Id.* at 230.

A provider of CMRS (commercial mobile radio service) such as Verizon is "a common carrier" subject to Title II of the Communications Act. 47 U.S.C. § 332(c)(1)(A). But Congress gave the Commission authority to render § 203 inapplicable to CMRS and, in 1994, the Commission exercised

that authority. *See* 47 C.F.R. § 20.15. For CMRS, the Commission thereby dissolved what the Supreme Court described as the "indissoluble unity" between § 203's tariff-filing requirement and the prohibition against rate discrimination in § 202. *Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440 (1907). In exempting CMRS providers from § 203, the Commission explained that "market forces are generally sufficient to ensure the lawfulness of rate levels, rate structures, and terms and conditions of service set by carriers who lack market power." *In re Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Services, Second Report and Order,* 9 F.C.C.R. 1411, 1478 (1994) ("*CMRS Second Report and Order*"). A carrier's success "should be driven by technological innovation, service quality, competition-based pricing decisions, and responsiveness to consumer needs — and not by strategies in the regulatory arena." *Id.* at 1420. Although the Commission was later given the authority, in the 1996 Telecommunications Act, 47 U.S.C. § 160(a), to "forbear from applying any regulation or provision" of the Communications Act to a telecommunications carrier, it has not exempted CMRS from § 201 or § 202.

In the past, the question whether a common carrier engaged in "unjust or unreasonable discrimination" in violation of § 202 was largely determined by reference to the carrier's tariff. If the carrier and the customer negotiated a special rate, different than that set forth in the rate under § 203, a finding of discrimination usually followed. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130 (1990). In the new regime, however, this obviously cannot be the measure of what constitutes "unjust or unreasonable discrimination." CMRS providers do not file tariffs; in fact, the Commission has forbidden them from doing so. 47 C.F.R. § 20.15(c). How then does one determine whether such a carrier has engaged in unjust or unreasonable discrimination in violation of § 202?

One might say that whenever Verizon charges one customer less than its publicly advertised rates it engages in unreasonable discrimination against all other similarly-situated cus-

tomers, in violation of § 202. This is Orloff's main argument. Setting rates by negotiation, Orloff contends, is inconsistent with Verizon's designation — in § 332 — as a "common carrier" because a "common carrier does not 'make individualized decisions, in particular cases, whether and on what terms to deal.' " *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979) (quoting *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) ("*NARUC I*")); *see, e.g.*, *U.S. Telecomm. Ass'n v. FCC*, 295 F.3d 1326, 1329, 1332–33 (D.C. Cir. 2002); *Virgin Islands Tel. Corp. v. FCC*, 198 F.3d 921, 925 (D.C. Cir. 1999).

Orloff's point is a fair one, but we do not believe it exposes an error in the Commission's decision. The traditional, common law definition of a communications common carrier, reflected in the cases just cited, was employed, "to draw a coherent line between common and private carriers," *NARUC I*, 525 F.2d at 642, which is how the Supreme Court used the definition in *Midwest Video*. When the common carrier designation fit, the regulatory consequences depended upon the requirements set forth in Title II. Much of "the Communications Act's subchapter applicable to Common Carriers, *see* 47 U.S.C. §§ 201–228, . . . [had been] premised upon the tariff-filing requirement of § 203." *MCI Telecomm.*, 512 U.S. at 230. The Commission reviewed and approved rates and determined what level of profits the regulated carrier would earn. The carrier had to file its rates and make them publicly available; and it could not charge different rates without making a new filing and then waiting for a specified period of time (120 days under § 203(b)(1)). *See generally* Joseph D. Kearney & Thomas W. Merrill, *The Great Transformation of Regulated Industries Law*, 98 Colum. L. Rev. 1323, 1359–61 (1998). All of that has changed for CMRS, at least in the Cleveland area. Rates are determined by the market, not the Commission, as are the level of profits. With § 203 no longer applicable, there is no statutory provision even requiring that the carrier publicly disclose any of its rates, although competition will force it to do so. And if Verizon wishes to change its advertised rates, or terms of service, it is free to do so without Commission approval and

without waiting even for a moment. It may, for instance, run a commercial in the morning offering prospective customers a free cell phone, revoke the offer that afternoon, and then offer a cell phone for half price on the following day.

As common carriers under § 332, CMRS providers still have duties. They cannot — as the Commission put it — refuse "to deal with any segment of the public whose business is the 'type normally accepted.'" *Orloff*, 17 F.C.C.R. at 8997. They cannot decline "to serve any particular demographic group (*e.g.* customers who are of a certain race or income bracket)." *Id.* Nothing in the record indicated that Verizon fell short on either count.

Because the current system bears so little resemblance to the paradigm that existed prior to the time the Commission, with the blessing of Congress, began deregulating CMRS, we agree with the Commission that the legality of Verizon's sales concessions practice depends not on the company's designation as a common carrier, but on § 202 (and § 201). If "a carrier unreasonably discriminated against rural customers, who lacked adequate choice of providers, in favor of urban customers," or if "a CMRS market were inadequately competitive" or if there were other market failures limiting "consumers' abilities to protect themselves, Section 202 could be implicated." *Id.* at 8997–98. But the Commission emphasizes that § 202 prohibits only *unjust* and *unreasonable* discrimination in charges and service. Orloff is therefore not entitled to prevail merely by showing that she did not receive all the sales concessions Verizon gave to some other customers — that, in other words, Verizon engaged in discrimination. Verizon may still show that the difference in treatment was reasonable. *See id.* at 8993–94.

With respect to the Commission's interpretation of § 202 as applied to CMRS, the "generality of these terms" — unjust, unreasonable — "opens a rather large area for the free play of agency discretion, limited of course by the familiar 'arbitrary' and 'capricious' standard in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)." *Bell Atlantic Tel. Co. v.*

*FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996). In Orloff's view the Commission acted arbitrarily and capriciously because it departed from precedent without giving an adequate explanation. She points out that the Commission and this court have allowed common carriers to charge customer-specific rates only if they offered the same terms to other, similarly situated customers. *See, e.g., MCI Telecomm. Corp. v. FCC*, 917 F.2d 30, 37–38 (D.C. Cir. 1990); *In re Panamsat Corp. v. Comsat Corp.*, 12 F.C.C.R. 6952, 6965–66 (1997); *In re Competition in the Interstate Interexchange Marketplace*, 10 F.C.C.R. 4562, 4566 (1995). Yet here the Commission allowed Verizon to offer concessions to some customers and not others, even though there is no discernible difference between the two groups.

Once again, the cases on which Orloff relies deal with dominant carriers whose charges were regulated through § 203's tariff-filing requirement. Allowing those carriers to grant discriminatory concessions would have undermined the regulatory scheme then in effect. Filed tariffs are pointless if the carrier can depart from them at will. Permitting a dominant carrier to discriminate would give it the power to control its customers' economic fates, thus defeating one of the main purposes of common carrier regulation. *See ICC v. Baltimore & Ohio R.R.*, 145 U.S. 263, 276 (1892). But as the Commission reasoned, the situation in the Cleveland-area mobile phone market is distinguishable. Not only are there no filed rates, but also neither Verizon nor any other CMRS provider is dominant. Customers dissatisfied with Verizon's charges or service may simply switch to another provider. As the Commission also ruled, Orloff is not in a position to argue that some potential customers may be unaware that if they haggle with Verizon, they may get a better deal. "Orloff availed herself of the benefits of haggling, receiving numerous concessions from [Verizon] on two occasions." *Orloff*, 17 F.C.C.R. at 8998.

In considering whether Verizon justified its sales concession practices as reasonable, the Commission was "entitled to value the free market, the benefits of which are well-established." *MCI Worldcom v. FCC*, 209 F.3d 760, 766

(D.C. Cir. 2000). Haggling is a normal feature of many competitive markets. It allows consumers to get the full benefit of competition by playing competitors against each other. Here Verizon has adopted the practice as a competitive marketing strategy. Consumers, including Orloff, can only benefit.

Orloff objects that the Commission, rather than focusing on the nature of the CMRS market in the Cleveland area, should have compared the deal she struck with Verizon with the concessions Verizon made for others. Once Verizon negotiates a particular concession with one customer, Orloff says it must offer the same concession to all customers. This ratcheting effect would, as a practical matter, have one of two effects. Either Verizon would end its concessions practice altogether, rendering its advertised rates analogous to tariffs, or it would have to devise some sort of tracking system to identify each customer concession resulting from negotiation. The Commission, which is expert in these matters, found the latter prospect unduly burdensome. *Orloff*, 17 F.C.C.R. at 8998–99. As to the former, the Commission properly determined that Verizon's concessions practice benefitted consumers and was therefore reasonable under § 202. By giving concessions, Verizon could "respond immediately to changes in the marketplace and to individual customer demand when existing plans and promotions were inadequate." *Id.* On the other hand, accepting Orloff's arguments would harm consumers and would be contrary to Congress' clearly articulated policy in favor of competition in telecommunications services. *See Worldcom, Inc. v. FCC*, 238 F.3d 449, 454 (D.C. Cir. 2001).

The petition for review is denied.