# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2012   Decided December 4, 2012

No. 11-1135

CELLCO PARTNERSHIP,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

BRIGHT HOUSE NETWORKS, LLC, ET AL.,
INTERVENORS

———

Consolidated with 11-1136

———

On Petition for Review of and On Appeal from an Order of
the Federal Communications Commission

———

*Helgi C. Walker* argued the cause for appellant. With her
on the briefs were *Thomas R. McCarthy*, *Brett A. Shumate*,
*Henry Weissmann*, *Michael E. Glover*, and *John T. Scott III.*
*Andrew G. McBride* entered an appearance.

*Peter Karanjia*, Deputy General Counsel, Federal
Communications Commission, argued the cause for appellee.
With him on the brief were *Catherine G. O'Sullivan* and

*Finnuala K. Tessier*, Attorneys, U.S. Department of Justice, *Austin C. Schlick*, General Counsel, Federal Communications Commission, *Richard K. Welch*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel.

*Richard P. Bress* argued the cause for intervenors. With him on the brief were *James H. Barker, Matthew A. Brill*, *Alexander Maltas*, *Carl W. Northrop*, *Michael L. Lazarus*, *Caressa D. Bennet*, *Michael R. Bennet*, *Jill Canfield*, *Daniel L. Brenner*, *Jessica L. Ellsworth*, *Peter M. Connolly*, and *Douglas E. Hart*.

*Carl W. Northrop*, *Michael L. Lazarus*, *Andrew Morentz* and *Mark A. Stachiw* were on the brief for intervenor MetroPCS Communications, Inc. in support of appellee.

*Thomas J. Sugrue*, *Luisa Lancetti*, *Howard J. Symons*, and *Russell H. Fox* were on the brief for intervenor T-Mobile USA, Inc. in support of appellee.

*Harold Feld* was on the brief for *amici curiae* Public Knowledge, et al. in support of appellee.

Before: TATEL, GARLAND, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Federal Communications Commission has long imposed "roaming" requirements on wireless telephone companies. Roaming occurs when wireless subscribers travel outside the range of their own carrier's network and use another carrier's network infrastructure to make a call. Until the issuance of the rule challenged in this case, mobile carriers' obligation to permit roaming extended

only to voice-telephone services. Recognizing the growing importance of mobile data in a wireless market in which smartphones—cellphones that can connect to the internet—are increasingly common, the Commission adopted a rule requiring mobile-data providers to offer roaming agreements to other such providers on "commercially reasonable" terms. Cellco Partnership, more commonly known as Verizon, challenges the "data roaming rule" on multiple grounds. Most significantly, Verizon argues that the Commission lacks statutory authority to issue the rule and that the rule unlawfully treats mobile-internet providers as common carriers. We disagree on both counts. Title III of the Communications Act of 1934 plainly empowers the Commission to promulgate the data roaming rule. And although the rule bears some marks of common carriage, we defer to the Commission's determination that the rule imposes no common carrier obligations on mobile-internet providers. In response to Verizon's remaining arguments, we conclude that the rule does not effect an unconstitutional taking and is neither arbitrary nor capricious. We therefore reject Verizon's challenge to the data roaming rule.

## I.

The Communications Act of 1934, 47 U.S.C. §§ 151 et seq., endows the Federal Communications Commission with broad authority to oversee wire and radio communication in the United States. Title II of the Act authorizes the Commission to regulate common carrier services, including telecommunications services like landline telephone services. *See id.* §§ 201 et seq. It also sets forth the duties of common carriers, including the obligations to "furnish . . . communication service upon reasonable request," *id.* § 201(a), to charge "just and reasonable" rates, *id.* § 201(b), and to refrain from "mak[ing] any unjust or unreasonable

discrimination in charges . . . or services," *id.* § 202(a). Although the Act's definition of "common carrier" is unsatisfyingly circular, *see id.* § 153(11) (defining a "common carrier" as "any person engaged as a common carrier for hire"), the Commission has interpreted it to exclude providers of "information services," defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, . . . or making available information via telecommunications." *Id.* § 153(24). *See Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C.R. 5901, 5919 ¶ 50 (2007) ("*Broadband Classification Order*").

Title III of the Act empowers the Commission to regulate radio transmissions, including traditional radio, broadcast television, and mobile telephony. *See id.* §§ 301 et seq. Although mobile telephony involves radio transmission and thus falls under the Commission's Title III authority, the Act provides that some mobile-telephone services are also subject to Title II's common carriage requirements. *See id.* § 332(c)(1)(A). In particular, section 332 specifies that providers of "commercial mobile services," such as wireless voice-telephone service, are common carriers, whereas providers of other mobile services are exempt from common carrier status. *See id.* § 332(d)(3), (c)(2).

The Commission has previously determined and here concedes that wireless internet service both *is* an "information service" and *is not* a "commercial mobile service." *See Broadband Classification Order*, 22 F.C.C.R. at 5915–21 ¶¶ 37–56; Verizon's Br. 11 n.6, 19 n.11. Accordingly, mobile-data providers are statutorily immune, perhaps twice over, from treatment as common carriers. *See id*. Given that mobile-voice providers *are* considered common carriers, the

exclusion of mobile-data services from the common carriage regime subjects cellphone companies like Verizon, which provide both services, to a bifurcated regulatory scheme. *Cf. National Association of Regulatory Utility Commissioners v. FCC* (*NARUC II*), 533 F.2d 601, 608 (D.C. Cir. 1976) (noting that a single entity "can be a common carrier with regard to some activities but not others"). Even though wireless carriers ordinarily provide their customers with voice and data services under a single contract, they must comply with Title II's common carrier requirements only in furnishing voice service. Likewise, the Commission may invoke both its Title II and its Title III authority to regulate mobile-voice services, but may not rely on Title II to regulate mobile data.

The Commission's foray into roaming began in 1981 when it adopted a limited voice roaming requirement as part of the original cellular-service rules. *See An Inquiry Into the Use of the Bands 825–845 MHz and 870–890 MHz for Cellular Communications Systems and Amendment of Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems*, 86 F.C.C. 2d 469, 502 ¶¶ 75–76 (1981); *see also Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile-data services*, 26 F.C.C.R. 5411, 5412 ¶ 3 & n.2 (2011) ("*Data Roaming Order*") (explaining origins of roaming regulation). As cellphones grew ubiquitous and nationwide travel more frequent, the need for more robust roaming regulations became clear. Although some carriers were voluntarily entering into roaming arrangements with other providers—under which the subscribers of one carrier could roam on the network of the other—in many cases subscribers of smaller carriers remained unable to use their mobile phones when traveling outside their home networks. Seeking to promote nationwide access to cellphone service,

the Commission in 2007 dramatically expanded carriers' roaming obligations by mandating that they offer roaming agreements to other carriers on a just, reasonable, and nondiscriminatory basis. *See Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers*, 22 F.C.C.R. 15817, 15818 ¶¶ 1–3 (2007) ("*2007 Voice Roaming Order*"). In using this classic common carriage standard, the Commission expressly invoked Title II, explaining that mobile-voice providers have "a common carrier obligation" to provide roaming. *See id.* at 15818 ¶ 1. Three years later, in 2010, the Commission further expanded and clarified voice providers' roaming obligations in ways not relevant to this case. *See Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile-data services*, 25 F.C.C.R. 4181, 4190–4201 ¶¶ 18–40 (2010) ("*2010 Voice Roaming Order*"). Under these Voice Roaming Orders, subscribers of a small carrier in Nebraska, for example, can travel to New York and use Verizon's cell towers to make phone calls. Demonstrating the success of the orders, most cellphone users experience no service disruption when traveling beyond their provider's service range.

The roaming regulations, however, extended only to mobile-voice services. Absent an obligation to permit roaming, some mobile-data providers were voluntarily entering into data roaming agreements, but this was often not the case, especially on "advanced '3G' data networks." *See Data Roaming Order*, 26 F.C.C.R. at 5424–27 ¶¶ 24–27. Conscious of the increasing importance of mobile internet and seeking to promote nationwide access, the Commission began formal consideration of whether and how it might institute a data-roaming requirement. *See 2007 Voice Roaming Order*, 22 F.C.C.R. at 15845–47 ¶¶ 77–81. To that end, when the

Commission issued the 2007 Voice Roaming Order, it sought comment on the propriety of extending roaming obligations to data services as well as on the potential "legal and policy basis for doing so." *Id.* at 15845 ¶ 79. In the 2010 Voice Roaming Order, the Commission again requested input about a potential data roaming rule. *See 2010 Voice Roaming Order*, 25 F.C.C.R. at 4207–24 ¶¶ 50–91.

Approximately two dozen parties, including numerous providers of mobile-internet services, filed formal comments in response to these requests. *See Data Roaming Order*, 26 F.C.C.R. at 5416–18 ¶¶ 11–12. All but two major national carriers—Verizon and AT&T—favored a data roaming rule in some form. *See id.* The supporting commenters emphasized that wireless providers must be able to offer nationwide internet access in order to compete in the current mobile marketplace. *See id.* at 5416–17 ¶ 11. The commenters also pointed out that because larger carriers had no obligation to offer roaming agreements, they were often unwilling to do so on reasonable terms. *See id.* Mandating that providers offer such agreements, the commenters maintained, would preserve appropriate incentives for investment in network expansion while ensuring that newer and smaller providers would be able to compete. *See id.* Verizon and AT&T opposed data roaming regulation on both legal and policy grounds. *See id.* at 5417–18 ¶ 12, 5439 ¶ 60. They argued not only that the Commission lacked statutory authority to obligate mobile-internet providers to offer roaming, but also that a data roaming rule was unnecessary—because providers were already entering into roaming agreements voluntarily—and inadvisable—because it would reduce investment incentives. *See id.* As Verizon and AT&T saw it, the benefit a data roaming rule would confer on smaller carriers would come at the expense of larger carriers because the obligation to share

network space would prevent them from fully capitalizing on their investments in network infrastructure.

Based on the record created in response to its 2007 and 2010 requests for comment, the Commission adopted the Data Roaming Order on April 7, 2011. *See id.* at 5411. In general terms, the Order instituted a rule requiring "providers of commercial mobile-data services to offer data roaming agreements to other such providers on commercially reasonable terms and conditions, subject to certain limitations." *Id.* at 5411 ¶ 1. Addressing AT&T's and Verizon's objections at length, the Commission ultimately found that the data roaming rule would "best promote consumer access to seamless mobile data coverage nationwide, appropriately balance the incentives for new entrants and incumbent providers to invest in and deploy advanced networks across the country, and foster competition among multiple providers in the industry." *Id.* at 5418 ¶ 13. The Commission explained that it was adopting the rule through an exercise of its authority under "several provisions of Title III," *id.* at 5412 ¶ 2, including section 303(b), which authorizes the Commission to "[p]rescribe the nature of the service to be rendered by each class of licensed station." 47 U.S.C. § 303(b); *see also Data Roaming Order*, 26 F.C.C.R. at 5441 ¶ 62. The Commission also noted that the rule "furthers the goals" of other statutory provisions, *see Data Roaming Order*, 26 F.C.C.R. at 5442 ¶ 64 (citing section 706(a) and (b) of the Telecommunications Act of 1996, 47 U.S.C. § 1302), and suggested in a footnote that the rule falls within the agency's "ancillary authority." *See id.* at 5442 ¶ 63 n.176. Two members of the Commission dissented, arguing primarily that the data roaming rule violates the Communications Act and Commission precedent by imposing a common carriage obligation on mobile data providers. *See*

*id.* at 5483–84 (Dissenting Statement of Commissioner McDowell); *id.* at 5487–88 (Dissenting Statement of Commissioner Baker).

Several features of the data roaming rule are especially relevant here. The rule requires providers to "offer data roaming arrangements on commercially reasonable terms and conditions," but it permits them to "negotiate the terms of their roaming arrangements on an individualized basis." *Id.* at 5432 ¶ 43. As the Order explains, this means that providers may tailor roaming agreements to "individualized circumstances without having to hold themselves out to serve all comers indiscriminately on the same or standardized terms." *Id.* at 5433 ¶ 45. The Order also excuses providers from offering data roaming where it is not "technically feasible," *id.* at 5432 ¶ 43, and establishes a process for resolving disputes arising out of data-roaming negotiations that is "similar" to the voice roaming dispute resolution process. *Id.* at 5448 ¶ 74.

Challenging the Commission's decision, Verizon advances two primary arguments and a flurry of smaller-scale objections. First, it argues that the data roaming rule violates the statutory prohibition against treating mobile-internet providers as common carriers. Second, it asserts that the Commission lacked affirmative authority under Title III or any other statutory provision to promulgate the rule. Although Verizon presents the common carrier issue first, we think it more natural to begin with the question of the Commission's affirmative authority. We thus address these issues in Sections II and III in that sequence. Then, in Section IV we consider Verizon's arguments that the data roaming rule effects an unconstitutional taking and is arbitrary and capricious.

Although Verizon filed both a petition for review pursuant to 47 U.S.C. § 402(a) and a notice of appeal pursuant to 47 U.S.C. § 402(b), "we need not decide which is the more appropriate" vehicle for our review "[s]ince . . . we plainly have jurisdiction by the one procedural route or the other." *United States v. Green*, 499 F.2d 538, 540 n.5 (D.C. Cir. 1974).

## II.

The Commission identified three potential sources of regulatory authority for the data roaming rule: Title III of the Communications Act, section 706 of the Telecommunications Act of 1996, and the Commission's ancillary authority, *see Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir. 2010) (explaining that the Commission has authority to promulgate regulations "'reasonably ancillary to the . . . effective performance of its statutorily mandated responsibilities'" (quoting *American Library Association v. FCC*, 406 F.3d 689, 692 (D.C. Cir. 2005))). Verizon argues that not one of these authorities empowers the Commission to promulgate the rule. In deciding whether the Commission acted pursuant to delegated authority, we begin—and end—with Title III.

The extent of the Commission's Title III authority is, of course, a question of statutory interpretation. *Chevron*'s familiar framework governs our review of the Commission's interpretation of the Communications Act, its organic statute. *See National Cable & Telecommunication Association v. Brand X Internet Services*, 545 U.S. 967, 981 (2005) ("[W]e apply the *Chevron* framework to the Commission's interpretation of the Communications Act."). According to Verizon, however, *Chevron* deference does not extend to interpretive questions, like this one, that implicate the scope of an agency's jurisdiction. But this Court has repeatedly held otherwise. *See, e.g.*, *Transmission Agency of Northern*

*California v. FERC*, 495 F.3d 663, 673 (D.C. Cir. 2007) ("In determining whether FERC has acted beyond its jurisdiction, we grant FERC *Chevron* deference."); *National Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1403 (D.C. Cir. 1998) ("The 'jurisdictional' character of the issue has no effect on the level of deference . . . ."); *Oklahoma Natural Gas Co. v. FERC*, 28 F.3d 1281, 1283–84 (D.C. Cir. 1994) (discussing *Chevron*'s applicability to jurisdictional questions and ultimately proceeding under the *Chevron* framework). To be sure, as Verizon pointed out in a post-oral argument letter, the Supreme Court has granted certiorari on this issue. *See City of Arlington v. FCC*, 2012 WL 4748083 (U.S. Oct. 5, 2012) (No. 11-1545). But the outcome of that case will make no difference here for, as we shall explain, the statute clearly affords the Commission the ability to promulgate the data roaming rule. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Title III affords the Commission "broad authority to manage spectrum . . . in the public interest." *Data Roaming Order*, 26 F.C.C.R. at 5440 ¶ 62. In invoking its Title III powers, the Commission both spoke in general terms about Title III's broader purposes and relied on several of its specific provisions. It focused in particular on two provisions in section 303: section 303(b), which authorizes the agency to "'[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class'"; and section 303(r), which empowers the Commission, subject to the demands of the public interest, to "'[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the

provisions of this chapter.'" *See id.* at 5441 ¶ 62 & nn. 172–73 (quoting 47 U.S.C. § 303(b), (r)). In addition, the Commission pointed to section 316, which empowers it to modify existing licenses, including by rulemaking, "if it determines that such action 'will promote the public interest, convenience, and necessity.'" *See id.* at 5441 ¶ 62 & nn. 170–71 (quoting 47 U.S.C. § 316(a)(1) and citing, *e.g.*, *Celtronix Telemetry v. FCC*, 272 F.3d 585, 589 (D.C. Cir. 2001)). These provisions, the Commission concluded, authorize it to adopt the data roaming rule. *See id.* at 5442 ¶ 63.

Verizon argues that the Commission's interpretation of its Title III authority represents "an unprecedented and unbounded theory of regulatory power over wireless Internet service under its general 'public interest' authority." Verizon's Reply Br. 18. Focusing on the Commission's more general statements about Title III instead of its references to specific sections of the statute, Verizon maintains that the Commission justified the rule solely on the basis of its finding that the rule would serve the public interest. Because "[t]he FCC cannot act in the 'public interest' if the agency does not otherwise have the authority to promulgate the regulations at issue," *Motion Picture Association of America, Inc. v. FCC* (*MPAA*), 309 F.3d 796, 806 (D.C. Cir. 2002), Verizon believes that the Commission's public-interest finding is insufficient to bring the rule within Title III's scope.

Although Title III does not "confer an unlimited power," *NBC v. United States*, 319 U.S. 190, 216 (1943), the Supreme Court has emphasized that it does endow the Commission with "expansive powers" and a "comprehensive mandate to 'encourage the larger and more effective use of radio in the public interest.'" *Id.* at 219 (quoting 47 U.S.C. § 303(g)). True, the Commission may not rely on Title III's public-

interest provisions without mooring its action to a distinct grant of authority in that Title. *See MPAA*, 309 F.3d at 806. But here the Commission did not rely solely on its power to act in the public interest. Instead, it expressly relied on particular delegations of authority in Title III, such as section 303(b).

As the Order itself explains, section 303(b) directs the Commission, consistent with the public interest, to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within any class." 47 U.S.C. § 303(b). As a glance at a dictionary confirms, "prescribe" means, among other things, "to lay down a rule." Webster's Third New International Dictionary 1792 (1993). That is exactly what the data roaming rule does—it lays down a rule about "the nature of the service to be rendered" by entities licensed to provide mobile-data service. Verizon argues that the data roaming rule exceeds the bounds of section 303(b) because instead of merely *prescribing* the nature of a service, the rule *mandates* the provision of service. Not so. Like any other entity, Verizon may choose not to provide mobile-internet service. Like other rules that govern Title III services, the data roaming rule merely defines the form mobile-internet service must take for those who seek a license to offer it. Especially when taken together with section 303(r), which supplements the Commission's ability to carry out its mandates via rulemaking even if it confers no independent authority, *see MPAA*, 309 F.3d at 806, and section 316, which enables the Commission to "alter the term of existing licenses by rulemaking," *Celtronix Telemetry*, 272 F.3d at 589, we think it clear that the data roaming rule falls well within the Commission's Title III authority.

Verizon nonetheless contends that the Data Roaming Order runs afoul of three limitations on the Commission's regulatory power. First, relying on the Supreme Court's statement in *FCC v. Sanders Brothers Radio Station* that the Communications Act "does not essay to regulate the business of the licensee," 309 U.S. 470, 475 (1940), Verizon argues that the data roaming rule exceeds the Commission's power to intrude into carriers' business affairs. *Sanders Brothers*, however, held merely that the Commission has "no supervisory control of [licensees'] programs, . . . business management or . . . policy." *Id.* It stands only for the uncontroversial proposition that the Commission lacks a general mandate to regulate a licensee's business separate and apart from the authority otherwise conferred by Title III. Nothing in *Sanders Brothers* imposes an independent limitation on the Commission's regulatory authority.

Second, Verizon invokes *Regents of University System of Georgia v. Carroll*, which held that "the Communications Act [does not] give authority to the Commission to determine the validity of contracts between licensees and others." 338 U.S. 586, 602 (1950). Because the data roaming rule establishes the terms on which providers must deal with third parties—namely, other providers who wish to enter into roaming agreements and their subscribers—Verizon argues that it conflicts with *Carroll*. Unlike *Sanders Brothers*, *Carroll* does impose a limit on the Commission's regulatory authority. *Carroll*'s scope, however, is quite modest, as the decision holds only that the Commission lacks authority to invalidate licensees' contracts with third parties and to abrogate state-law contract remedies. *See id.* Although the data roaming rule dictates certain interactions between licensees and third parties, this kind of third-party impact differs in kind from the state-law contract issue at stake in *Carroll*. Because Verizon

nowhere suggests that the data roaming rule will void third-party contracts, *Carroll* does not stand in the Commission's way.

Third, Verizon contends that Title III gives the Commission no authority to make "fundamental changes" to the terms of existing licenses. *See MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 228 (1994) (holding that statutory "authority to 'modify' does not contemplate fundamental changes"); *Community Television, Inc. v. FCC*, 216 F.3d 1133, 1140–41 (2000) (applying that reasoning to section 316). Insisting that the data roaming rule effects a "revolutionary change to wireless licenses," Verizon's Br. 50, Verizon argues that the rule exceeds the Commission's Title III authority. Verizon is right that the Commission's section 316 power to "modif[y]" existing licenses does not enable it to fundamentally change those licenses. *See Community Television*, 216 F.3d at 1141. The data roaming rule, however, cannot be said to have wrought such a "fundamental change." Indeed, a comparison to the Supreme Court's decision in *MCI v. AT&T* makes this quite clear. There, the Court held that the Commission's power to "modify" requirements related to telecommunications carriers' obligation to file tariffs did not include the power to eliminate tariffs entirely. *See MCI*, 512 U.S. at 229; *see also Community Television*, 216 F.3d at 1141 (distinguishing *MCI*). Of course, given that the data roaming rule requires nothing more than the offering of "commercially reasonable" roaming agreements, it hardly effects such a radical change. Indeed, imposing a limited obligation to offer data-roaming agreements to other mobile-data providers "can reasonably be considered [a] modification[ ] of existing licenses." *Community Television*, 216 F.3d at 1141.

## III.

Having concluded that Title III authorizes the Commission to promulgate the data roaming rule, we arrive at the critical issue—Verizon's contention that the rule contravenes the Communications Act's prohibition against treating mobile-internet providers as common carriers. Before resolving the statutory question, however, we must address Verizon's antecedent argument, namely, that the Commission is bound by its statement in the Voice Roaming Orders that automatic roaming—that is, roaming that takes place pursuant to a preexisting agreement between providers, *see Data Roaming Order*, 26 F.C.C.R. at 5412 ¶ 3 n.2—is inherently common carriage. In support, Verizon points to portions of those Orders that speak to roaming in general terms. But context matters. In characterizing the voice roaming rule as a common carrier requirement, the Commission was merely invoking its Title II authority and applying that Title's common carriage standards to voice roaming. Especially given the "high level of deference due to an agency in interpreting its own orders and regulations," *MCI Worldcom Network Services, Inc. v. FCC*, 274 F.3d 542, 548 (D.C. Cir. 2001), we have little difficulty concluding that the Commission's classification of the voice roaming rule as a common carrier obligation does not amount to a conclusion that automatic-roaming requirements necessarily entail common carriage. We thus must address Verizon's statutory argument.

Whether the data roaming rule runs afoul of the statutory exclusion of mobile-internet providers from common carrier status hinges on the meaning of the term "common carrier." Again, Verizon contests the applicability of *Chevron* deference. Relying primarily on our decision in *National Association of Regulatory Utility Commissioners v. FCC*

(*NARUC I*), 525 F.2d 630, 644 (D.C. Cir. 1975), Verizon insists that the Commission's interpretation of "common carrier" warrants no deference because the Act merely codified a concept of common carriage that was well established at common law. But to the extent we suggested as much in *NARUC I*, a decision predating *Chevron*, that suggestion was dicta. Instead, we are bound by our express determination in *U.S. Telecom Association v. FCC*, 295 F.3d 1326 (D.C. Cir. 2002), that the Commission's interpretation and application of the term "common carrier" warrants *Chevron* deference. *See id.* at 1331–32.

In arguing that the data roaming rule imposes a common carriage obligation, Verizon relies primarily on the Supreme Court's decision in *FCC v. Midwest Video Corp.* (*Midwest Video II*), 440 U.S. 689 (1979). There, the Court struck down the Commission's "public access" rules on the ground that the agency had "relegated cable systems, *pro tanto*, to common carrier status." *Id.* at 700–01. Because the Communications Act provides that an entity "engaged in . . . broadcasting shall not . . . be deemed a common carrier," 47 U.S.C. § 153(11), and because the public-access rules "impose[d] common-carrier obligations on cable operators," *Midwest Video II*, 440 U.S. at 701, the Court concluded that the Commission lacked authority to promulgate them. According to Verizon, the data roaming rule similarly imposes a common carriage obligation on an entity statutorily excluded from common carrier status. At oral argument, Verizon made its position crystal clear: because the company does not qualify as a common carrier with respect to mobile-data services, the Commission has no authority to compel it to permit other providers' subscribers to roam on its network. *See* Oral Arg. Tr. 23–24.

The Commission concedes that, in keeping with *Midwest Video II*, it has no authority to treat mobile-data providers like Verizon as common carriers. Rather, the Commission defends its conclusion, reached after express consideration of Verizon's position, that the data roaming rule does not relegate mobile-data providers to common carrier status. *See Data Roaming Order*, 26 F.C.C.R. at 5444–46 ¶ 68. The dispute thus turns on whether the requirements imposed by the data roaming rule are, notwithstanding the Commission's contrary determination, fundamentally common carriage obligations. On the one hand, Verizon points to features of the rule it contends are characteristic of common carriage, such as the enforceable obligation to offer service to all comers and the similarity between the rule's "commercially reasonable" standard and the "just and reasonable" standard applicable to common carriers. On the other hand, the Commission's Order highlights those aspects of the rule that diverge from the classic common carrier duties, like the permissibility of individualized contract terms and the distance between "commercially reasonable" and "just and reasonable." *See id.* The rule plainly bears some marks of common carriage. The question is whether those marks so predominate as to "relegate[ ]" mobile-internet providers "to common-carrier status." *Midwest Video II*, 440 U.S. at 700–01.

A brief history of common carriage helps answer this question. For centuries, common carriage principles have structured the transportation and communications industries. Borrowing from English common law traditions that imposed certain duties on individuals engaged in "common callings," such as innkeepers, ferrymen, and carriage drivers, American common law has long applied the concept of common carriage to transportation and communications enterprises. *See, e.g.*, *Interstate Commerce Commission v. Baltimore &*

*O.R. Co.*, 145 U.S. 263, 275 (1892) (explaining that even prior to the passage of the Interstate Commerce Act, railroads were bound by the common law duties of common carriers); *Western Union Telegraph Co. v. Call Publishing Co.*, 181 U.S. 92, 98, 102 (1901) (telegraph company subject to common law common carriage duties). Under the common law, all comers had "equal rights" of access to a common carrier's enterprise, "both in respect to service and charges." *Western Union*, 181 U.S. at 100.

Over the decades, these common law duties were codified in a variety of statutory regimes. In 1887, Congress passed the Interstate Commerce Act, 24 Stat. 379, which created the Interstate Commerce Commission ("ICC") and codified the common carriage obligations of rail carriers. The Act's "great purpose" was "to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination." *New York, New Haven & Hartford R.R. v. ICC,* 200 U.S. 361, 391 (1906). Later, the Mann-Elkins Act of 1910, 36 Stat. 539, brought the telecommunications industry under the purview of the Interstate Commerce Act and the ICC. Although the Communications Act of 1934 transferred regulatory authority over telecommunications from the ICC to the FCC, Title II's language was "largely copied" from the Interstate Commerce Act and the concept of common carriage remained generally unchanged. *See Global Crossing Telecom., Inc. v. Metrophones Telecom., Inc.*, 550 U.S. 45, 48–50 (2007).

Of course, telecommunications carriers remain subject to common carrier regulation under Title II. *See* 47 U.S.C. § 153(51); *id.* §§ 201 et seq. Over the years, however, the

Commission has relaxed the duties of common carriers in certain respects, and the line between common carriers and private carriers, *i.e.*, entities that are not common carriers, has blurred. For instance, the Commission has ruled that tariff requirements, the centerpiece of the Interstate Commerce Act, are no longer applicable to certain common carrier services, thereby "dissolving what the Supreme Court described as the 'indissoluble unity' between [the] tariff-filing requirement and the prohibition against rate discrimination." *Orloff v. FCC*, 352 F.3d 415, 418–19 (D.C. Cir. 2003) (quoting *Texas & Pacific Railway v. Abilene Cotton Oil Co.*, 204 U.S. 426, 440 (1907)).

The cases relied on by the parties here implicate the evolving meaning of common carriage and courts' efforts to pin down the essence of common carriage in the midst of changing technology and the evolving regulatory landscape. For example, in *NARUC I* we distinguished between common and private carriers by observing that "[t]he common law requirement of holding oneself out to serve the public indiscriminately draws . . . a logical and sensible line between the two types of carriers." 525 F.2d at 642. Consistent with this principle, we upheld the Commission's classification of certain mobile-service providers as private carriers where the providers were able to "negotiate with and select future clients on a highly individualized basis." *Id.* at 643. We elaborated on this distinction in *NARUC II*, concluding that "the primary sine qua non of common carrier status is a quasi-public character, which arises out of the undertaking 'to carry for all people indifferently . . . .'" 533 F.2d at 608 (quoting *Semon v. Royal Indemnity Co.*, 279 F.2d 737, 739 (5th Cir. 1960)). "That is to say," we went on to explain, "a carrier will not be a common carrier where its practice is to make individualized decisions in particular cases whether and on

what terms to serve." *Id.* at 608–09. In still another case, *Southwestern Bell Telephone Co. v. FCC*, we put it this way: "[T]he indiscriminate offering of service on generally applicable terms . . . is the traditional mark of common carrier service." 19 F.3d 1475, 1481 (D.C. Cir. 1994). Applying this standard, we determined that the services in question did not qualify as common carrier services because they were offered pursuant to "individually tailored arrangements." *Id.* Finally, in a decision that perhaps reflects the high-water mark of the broadening definition of common carriage, we held in *Orloff v. FCC* that Verizon did not run afoul of Title II's common carriage requirements when it engaged in individualized negotiations. *See* 352 F.3d at 419–21.

Considering these cases together, we glean several basic principles. If a carrier is forced to offer service indiscriminately and on general terms, then that carrier is being relegated to common carrier status. *See Southwestern Bell*, 19 F.3d at 1481; *NARUC I*, 525 F.2d at 642; *NARUC II*, 533 F.2d at 608. But perhaps more importantly, the Commission has significant latitude to determine the bounds of common carriage in particular cases. Moreover, there is an important distinction between the question whether a given regulatory regime is *consistent* with common carrier or private carrier status, *see, e.g.*, *Orloff*, 352 F.3d at 419–21, and the *Midwest Video II* question whether that regime *necessarily confers* common carrier status, *see Midwest Video II*, 440 U.S. at 700–02. Accordingly, even if a regulatory regime is not so distinct from common carriage as to render it inconsistent with common carrier status, that hardly means it is so fundamentally common carriage as to render it inconsistent with private carrier status. In other words, common carriage is not all or nothing—there is a gray area in which although a given regulation might be applied to

common carriers, the obligations imposed are not common carriage *per se*. It is in this realm—the space between *per se* common carriage and *per se* private carriage—that the Commission's determination that a regulation does or does not confer common carrier status warrants deference. *Cf. U.S. Telecom Association*, 295 F.3d at 1331–32 (deferring to Commission's interpretation of "common carrier"). Such is the case with the data roaming rule.

Comparing the data roaming rule to the public-access television rules struck down in *Midwest Video II* demonstrates the reasonableness of the Commission's conclusion that the data roaming rule imposes obligations that differ materially from the kind of requirements that necessarily amount to common carriage. In deciding that the public-access rules "relegated cable systems, *pro tanto*, to common-carrier status," *Midwest Video II*, 440 U.S. at 700–01, the Court highlighted aspects of those rules that "plainly impose[d] common-carrier obligations on cable operators." *Id.* at 701. Specifically, the rules required cable systems "to hold out dedicated channels on a first-come, nondiscriminatory basis," *id.* at 701–02, prohibited them from "determining or influencing the content of access programming," *id.* at 702, and "delimit[ed] what [they could] charge for access and use of equipment." *Id.* The public-access rules thus obligated cable companies to set aside a dedicated space for members of the public to broadcast any message they might choose either at no cost or at a price dictated by the Commission. This, the Court held, was core common carriage. *See id.* at 700–02.

*Midwest Video II* clarified, though, that not every limitation on an entity's discretion concerning with whom and how it will deal is necessarily common carriage. In both *United States v. Midwest Video Corp.* (*Midwest Video I*), 406

U.S. 649 (1972), and *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), for example, the Supreme Court upheld rules that limited cable operators' discretion to decide who could use their channels and what could be transmitted thereon. *Midwest Video II* expressly distinguished these cases. The origination rule upheld in *Midwest Video I*, the Court explained in *Midwest Video II*, "did not abrogate the cable operators' control over the composition of their programming, as [did] the access rules." *Midwest Video II*, 440 U.S. at 700. And the signal-carriage rules at issue in *Southwestern Cable*, the Court emphasized, "did not amount to a duty to hold out facilities indifferently for public use and thus did not compel cable operators to function as common carriers." *Id.* at 706 n.16. By distinguishing the rules upheld in *Midwest Video I* and *Southwestern Cable*, *Midwest Video II* itself makes clear that there is room for permissible regulation of private carriers that shares some aspects of traditional common carrier obligations.

The data roaming rule is much closer to the rules upheld in *Midwest Video I* and *Southwestern Cable* than the public-access rules set aside by *Midwest Video II*. Unlike the public-access rules, the data roaming rule leaves substantial room for individualized bargaining and discrimination in terms. The rule expressly permits providers to adapt roaming agreements to "individualized circumstances without having to hold themselves out to serve all comers indiscriminately on the same or standardized terms." *Data Roaming Order*, 26 F.C.C.R. at 5433 ¶ 45. Given this, like the rule at issue in *Southwestern Cable* and distinguished by *Midwest Video II*, the data roaming rule does "not amount to a duty to hold out facilities *indifferently* for public use." *Midwest Video II*, 440 U.S. at 706 n.16 (emphasis added).

True, providers must offer terms that are "commercially reasonable." But the data roaming rule, unlike the voice roaming rule, imposes no presumption of reasonableness. And the "commercially reasonable" standard, at least as defined by the Commission, ensures providers more freedom from agency intervention than the "just and reasonable" standard applicable to common carriers. *Cf. Morgan Stanley Capital Group, Inc. v. Public Utility District No. 1 of Snohomish County*, 554 U.S. 527, 532 (2008) (explaining that courts "afford great deference" to FERC's interpretation and application of "just and reasonable"). The rule itself actually spells out sixteen different factors plus a catch-all "other special or extenuating circumstances" factor that the Commission must take into account in evaluating whether a proffered roaming agreement is commercially reasonable. *See Data Roaming Order*, 26 F.C.C.R. at 5452–53 ¶ 86. The Commission has thus built into the "commercially reasonable" standard considerable flexibility for providers to respond to the competitive forces at play in the mobile-data market. Although the rule obligates Verizon to come to the table and offer a roaming agreement where technically feasible, the "commercially reasonable" standard largely leaves the terms of that agreement up for negotiation.

Given the room left for individualized negotiation, the clear differences between the public-access rules in *Midwest Video II* and this rule, and the deference owed the Commission, we conclude that the data roaming rule does not contravene the statutory exclusion of mobile-internet providers from common carrier status. But in so doing, we take Verizon's point that even if the rule *sounds* different from common carriage regulation, the more permissive language could, as applied, turn out to be no more than "smoke and mirrors." *See* Oral Arg. Tr. 60. That is, Verizon

worries that despite the rule's divergence from the classic vocabulary of common carriage, the Commission might nonetheless apply it in a manner that will effectively "relegate[ ]" mobile-data providers "to common-carrier status." *Midwest Video II*, 440 U.S. at 700–01. For instance, "commercially reasonable," as applied by the Commission, may in practice turn out to be no different from "just and reasonable."

Verizon, however, has brought a facial challenge, meaning that we must uphold the rule unless "no set of circumstances exists" in which it can be lawfully applied. *See Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). As explained above, the rule, as interpreted by the Commission, to which we owe deference, *see MCI Worldcom*, 274 F.3d at 548, does not on its face impose a common carriage obligation. That said, should the Commission apply the data roaming rule so as to treat Verizon as a common carrier, Verizon is free to return to court with an "as applied" challenge. In implementing the rule and resolving disputes that arise in the negotiation of roaming agreements, the Commission would thus do well to ensure that the discretion carved out in the rule's text remains carved out in fact.

## IV.

Only a few smaller claims remain for resolution.

Verizon argues that the data roaming rule results in an unconstitutional taking. In support, it cites *Bell Atlantic Telephone Companies v. FCC*, which barred the Commission from adopting rules that would effect unlawful takings in an "identifiable class" of applications absent a "clear warrant" in the statute. 24 F.3d 1441, 1444–46 (D.C. Cir. 1994). Verizon

contends that, like the rule at issue in *Bell Atlantic*, which gave third parties the right to physically co-locate equipment in local telephone companies' offices, *see id.*, the data roaming rule effects a physical taking in the form of the electrons that will occupy a host provider's physical infrastructure during roaming. In the alternative, Verizon argues that the rule results in a regulatory taking insofar as it interferes with providers' reasonable, investment-backed expectations that the Commission would maintain its deregulatory approach to mobile internet services.

Because regulatory-taking claims "require[ ] 'ad hoc, factual inquiries,'" we have followed "the *Bell Atlantic* approach to statutory interpretation" only in the context of *per se* physical takings. *See Building Owners and Managers Association v. FCC*, 254 F.3d 89, 99 (D.C. Cir. 2001) (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978)). And even if Verizon could show that the data roaming rule will effect physical takings in an "identifiable class" of applications, those takings would, as required by the rule, be compensated by a "commercially reasonable" payment. Because a "just[ly] compensat[ed]" taking is not unconstitutional, *see* U.S. Const. amend. V, nothing in the rule implicates the constitutional avoidance principle underlying *Bell Atlantic*.

In addition to its takings argument, Verizon advances three "arbitrary and capricious"-style claims. First, taking a slightly different approach to its common carrier argument, *see supra* Part III, Verizon contends that the Commission's conclusion that the data roaming rule imposed no common carrier obligation conflicts with its prior contrary classification of the voice roaming rule. Seeing no distinction between the two rules that could justify the agency's

conclusion that the one imposes a common carrier obligation while the other does not, Verizon believes that the Commission acted arbitrarily and capriciously. In support, it highlights the similarity between the "commercially reasonable" terms required by the data roaming rule and the "reasonable and nondiscriminatory" terms required by the voice roaming rule, as well as the similarities between the dispute-resolution processes established by the two rules. In response, the Commission emphasizes essentially the same features of the data roaming rule that we have held make it lawful for the Commission to apply it to private carriers—for example, the absence of a non-discrimination mandate. *See supra* Part III.

The two rules are undeniably similar. Indeed, as the data roaming rule's history makes clear, the rule derived from and was intended to complement the voice roaming rule. Both rules relate to the same technological phenomenon, "roaming," and both govern essentially the same entities, cellphone companies. But the same features of the data roaming rule that led us to credit the Commission's determination that it imposes no common carriage obligation are largely absent from the voice roaming rule. Unlike the data roaming rule, the voice roaming rule incorporates Title II's common carriage requirements, *see 2007 Voice Roaming Order*, 22 F.C.C.R. at 15818 ¶ 1, expressly forbids discrimination in terms, *see id.* at 15818 ¶ 1, 15826 ¶ 23, 15832 ¶ 37, institutes a presumption that requests for roaming are reasonable so long as there is network compatibility, *see id.* at 15831 ¶ 33, and relies on the classic "just and reasonable" standard, *id.* at 15818 ¶ 1. These distinctions more than suffice to justify the Commission's different classifications of the two rules.

Second, Verizon asserts that the Order is arbitrary and capricious because the few comments in the record from providers that had had trouble obtaining data-roaming agreements prior to the rule's institution were insufficient to justify such sweeping regulatory reform. Indeed, Verizon maintains that the record demonstrates that carriers *were* entering into roaming arrangements voluntarily. Accordingly, Verizon maintains that the record evinced no "problem in need of industry-wide regulation" and that the Commission thus "lack[ed] a rational basis" for promulgating the rule. Verizon's Br. 57–58.

The record refutes this argument. The Commission twice requested comment on the need for a data roaming rule, and every commenter besides Verizon and AT&T thought such a rule was necessary. *See Data Roaming Order*, 26 F.C.C.R. at 5416–18 ¶¶ 11–12. Moreover, the Commission expressly considered and rejected "arguments by AT&T and Verizon . . . that a data roaming rule [was] unnecessary because data roaming agreements [were] occurring without regulation," finding instead that "providers ha[d] encountered significant difficulties obtaining data roaming arrangements on advanced '3G' data networks, particularly from the major nationwide providers." *Id.* at 5424 ¶ 24. In fact, the Order cites comments revealing that carriers were having trouble reaching roaming agreements with Verizon in particular. *See id.* at 5425–26 ¶ 26. To be sure, the record contains contrary evidence proffered by Verizon and AT&T. But the Commission squarely addressed that evidence, and the data roaming rule reflects a viable policy choice justified by substantial record evidence. *Cf. Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (The APA requires only that the agency "examine the relevant data and articulate a satisfactory

explanation for its action," and "a court is not to substitute its judgment for that of the agency.").

Finally, Verizon argues that the Commission made a logical error when it weighed the costs of the data roaming rule against its benefits. Specifically, Verizon sees a conflict between (1) the Commission's argument that the data roaming rule would serve the public interest, and (2) its statement that, in light of the "high cost of roaming," "providers are unlikely to rely on roaming arrangements in place of network deployment." *Data Roaming Order*, 26 F.C.C.R. at 5423 ¶ 21. The Commission's attempt to downplay the possibility that the rule will discourage investment in network infrastructure on the ground that providers will rarely invoke it, Verizon contends, "is tantamount to saying the saving grace of the rule is that it will not entail costs if it is not used." *Business Roundtable v. SEC*, 647 F.3d 1144, 1156 (D.C. Cir. 2011).

Verizon oversimplifies the Commission's reasoning and omits key language in the Order, creating a contradiction where none exists. As one of several arguments against AT&T's and Verizon's assertions that the rule would remove incentives for investment, the Order states that "providers [would be] unlikely to rely on roaming arrangements in place of network deployment *as the primary source of their service provision*." *Data Roaming Order*, 26 F.C.C.R. at 5423 ¶ 21 (emphasis added). This hardly amounts to an assertion that providers will decline to rely on the rule at all; rather, the Order merely asserts that roaming will not displace network development as the "primary" means of serving subscribers. Indeed, the Commission carefully explained that roaming would assist new entrants into various markets and that those new entrants could then amass a customer base sufficient to enable them to develop their own infrastructure. *See id.* at

5421–23 ¶¶ 18–22. Verizon's myopic focus on part of a longer sentence plucked from a more extensive analysis obscures what the Order makes clear: that the Commission performed a thoughtful and nuanced balance of the costs and benefits of the data roaming rule.

## V.

For the foregoing reasons, we reject Verizon's challenge to the data roaming rule.

*So ordered.*