BROWN, Circuit Judge,
dissenting from the denial of rehearing en banc:
An independent federal agency sits at the intersection of the road to the White House and Constitution Avenue. Two statues that capture struggle between man and horse flank the agency. The statues are called “Man Controlling Trade,” and they depict a man, the government, restraining a horse, the marketplace. Though the statues look similar, they are not the same. On the President’s road, the horse— the marketplace — looks threatening, as if it will topple the brawny man trying to grasp the reins. On Constitution Avenue, the man — the government — is the threatening one, grasping the reins on both sides of the animal’s head; it appears he is trying to overpower a valiant and sympathetic horse. Here, as with the statues, an independent agency sits at the crossroads of competing visions — the President’s view of the Internet as threatening consumers, and the libertarian view of government as strangling the greatest market innovation of the last century. But an orthodox view of checks and balances leaves the choice of vision to Congress.
Congress passed, and President Clinton signed, the Telecommunications Act of 1996 (the “Act”), and its meaning could not be clearer: “to preserve the vibrant and competitive free market that presently exists for the Internet ..., unfettered by Federal or State regulation.” 47 U.S.C. *394 § 230(b)(2) (emphasis added). For nearly two decades, the federal government respected the Act’s deregulatory .policy. Presidents enforced it, Congresses did not alter it, and the Federal Communications Commission (“FCC” or the “Commission”) gave the Internet only a light-touch regulation. When FCC regulation went beyond a light touch, this Court intervened. See Verizon v. FCC, 740 F.3d 623, 629-30, 650-59 (D.C. Cir. 2014). However, the regulatory proposal now before the Court seeks to end this longstanding consensus.
When the FCC followed the Verizon “roadmap” to implement “net neutrality” principles without heavy-handed regulation of Internet access, the Obama administration intervened. Through covert and overt measures, FCC was pressured into rejecting this decades-long, light-touch consensus in favor of regulating the Internet like a public utility. This sea change places the Commission in control of Internet access. G. Nagesh & B. Mullins, Net Neutrality: How White House Thwarted FCC Chief, Wall St. J. (Feb. 4, 2015).
Abandoning Congress’s clear, deregula-tory policy does more than subject Internet access to a regulatory framework fit for the horse and buggy. The FCC’s statutory rewrite relegates the Constitution’s vital separation of powers framework to “a mere parchment delineation of the boundaries;” a hollow guarantee of liberty. See The Federalist No. 73 (Hamilton), p. 441 (Clinton Rossiter ed., 1961). If we take the Constitution’s structural restraints seriously, we cannot wish the Commission bon voyage on its Presidentially-imposed journey to become the Federal Cyberspace Commission. As that is exactly what the Court’s Opinion does, I respectfully dissent from the denial of rehearing en bane.[1]
I.

The Act’s Deregulatory Structure

Congress passed the Telecommunications Act of 1996 to amend the Communications Act of 1934, and in doing so, protect the innovation animating the Internet. See Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (“An Act [t]o promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies.”). The Act found that the “Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.” 47 U.S.C. § 230(a)(4) (emphasis added). Accordingly, Congress made keeping the Internet “unfettered” by “regulation” our national policy. Id. § 230(b)(2). Achieving this policy required a commitment to deregulatory tools and standards. The Act provided exactly that.
A

Internet Access As An Information Service

' As the Supreme Court explained, the 1996 Act incorporated FCC’s prior practice of distinguishing “basic services,” *395 which are provided by “telecommunications services,” and “enhanced services,” which are provided by “information services.” See National Cable & Telecommunications Ass’n v. Brand X Internet Services, 545 U.S. 967, 975-77, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (“Brand X’). “These two statutory classifications originated in the late 1970⅛, as the Commission developed rules to regulate data-proeess-ing services offered over telephone wires.” Id. at 976, 125 S.Ct. 2688.
“Basic services,” the analogue to the 1996 Act’s “telecommunications services,” were defined as “a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information.” Id. “IN]o computer processing or storage of the information” was part of “basic services,” “other than the processing or storage needed to convert the message into electronic form and then back into the ordinary language for purposes of transmitting it over the network — such as a telephone or facsimile.” Id. (emphasis added). The FCC, and then Congress in 1996, subjected these “basic services,” these “telecommunications services,” to common carrier regulation. Id.
“Enhanced services” are the analogue to “information services” in the 1996 Act, and they are not subject to common carrier regulation. Id. at 977, 125 S.Ct. 2688. The Commission historically defined “enhanced services” to be those where “computer processing applications [were] used to act on the content, code, protocol, and other aspects of the subscriber’s information,” like voicemail. See id. at 976-77, 125 S.Ct. 2688. The regulatory rub with “enhanced service,” as it is here with Internet access, is that it may be “offered via transmission wires” that, themselves, may constitute a “basic” or “telecommunications service.” See id. at 977, 125 S.Ct. 2688. Nevertheless, “given the fast-moving, competitive market” in which [enhanced services] were offered,” the FCC did not subject them to common carrier regulation. Id.
Just so, when Congress exempted “information services” from common carrier regulation in 1996, it followed the FCC’s longstanding course. See id. at 992, 125 S.Ct. 2688 (“Congress passed the definitions in the Communications Act against the background of this regulatory history, and we may assume that the parallel terms ‘telecommunications service’ and ‘information service’ substantially incorporated their meaning, as the Commission has held.”). The statute says “interactive computer service” includes “any” provider of “information service,” and “specifically a service or system that provides access to the Internet.” See 47 U.S.C. § 230(f)(2) (emphasis added). The Act also specifically excludes “telecommunications services” from the definition of “Internet access service.” Id. § 231(e)(4).
Unsurprisingly, the Act’s definition of “information service” fits broadband Internet access like a glove. “[Generating, acquiring, storing,” or “making available information via telecommunications” is what users do on social media websites like Facebook. See id. § 153(24). “[Transforming” or “utilizing” “information via telecommunications” is what users do on YouTube. See id. “[A]cquiring, storing,” and “retrieving ... information via telecommunications” is what users do with email. See id. The “offering of a capability” for engaging in all of these activities is exactly what is provided by broadband Internet access. See id.

B.

Authority To Forbear Burdensome Regulations

Before the 1996 Act, FCC sought to deregulate aspects of the telecommunica *396 tions industry on its own authority. But, its assertions of inherent power to “forbear” common carrier regulations engendered judicial skepticism. See, e.g., MCI Telecomms. Corp. v. AT & T, 512 U.S. 218, 234, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (“[T]he Commission’s desire to ‘increase competition’ cannot provide [it] authority to alter the well-established statutory filed rate requirements.... [S]uch considerations address themselves to Congress, not to the courts”); AT & T v. FCC, 978 F.2d 727, 736 (D.C. Cir. 1992) (“We understand fully why the Commission wants the flexibility to apply the tariff provisions of the Communications Act.... But the statute, as we have interpreted it, is not open to the Commission’s construction. The Commission will have to obtain congressional sanction for its desired policy course.”). Heeding these admonitions, Congress gave FCC statutory authority to forbear common carrier regulations in the 1996 Act. See Telecommunications Act of 1996, Pub. L. No. 104-104 § 401, 110 Stat. 56, 128 (1996) (entitled “Regulatory Forbearance” and inserting this section into the Communications Act’s Title I). Logically, forbearance is a tool for lessening common carrier regulation, not expanding it.
The authority to forbear regulation is limited to certain circumstances. FCC is only permitted to forbear when it has shown the common carriage provision is not needed: (1) to ensure just and reasonable prices and practices; or (2) to protect consumers. Forbearance must also be in the public interest. See 47 U.S.C. § 160(a).

C.

Mobile Broadband Cannot Be Common Carnage

The 1996 Act also ensured providers of mobile broadband Internet access “shall not ... be treated as a common carrier for any purpose.” See 47 U.S.C. § 332(c)(2) (emphasis added). Section 332 specifies only a commercial mobile service (or a “functional equivalent”) can be subject to common carrier regulation. Id. §§ 332(c)(1)(A), (c)(2), (d)(3). “Private mobile service,” in contrast, is “any mobile service” that is not a commercial one, and it may not be regulated as a common carrier. See id. § 332(d)(3). Section 332 defines “commercial mobile service” as a mobile service “provided for profit [that] makes interconnected service available [to the public].” Id. § 332(d)(1). The section then defines “interconnected service” as a “service that is interconnected with the public switched network (as such terms are defined by regulation by the [FCC]).” Id. § 332(d)(2). The FCC — until the Order at issue here — always defined “interconnected service” as “giv[ing] subscribers the capability to communicate ... [with] all other users on the public switched network.” See 47 C.F.R. § 20.3 (1994) (emphasis added). “[T]he public switched network” was, in turn, defined as the “common carrier switched network ... that use[s] the North American Numbering Plan.” Id. In other words, “the public switched network” is the telephone network. Though it is legislative history, the 1996 Act’s Conference Report buttresses this textual reading. See H.R. Rep. No. 103-213, at 495 (1993) (characterizing the House version of Section 332 as interconnection with “the Public switched telephone network,” even as both the House and Senate versions of Section 332 referred to “the public switched network”) (emphasis added), reprinted in 1993 U.S.C.C.A.N. 1088, 1184. Moreover, § 332(d)(2) refers to one network: “the public switched network.” In other words, the fact that another network can connect to the telephone network does not make that other network part of “the public switched network.”
*397 II.

FCC Practice Preserved The Free Market For Internet Access

It is bizarre that the FCC is now disputing the notion that Congress would “attempt to settle the regulatory status of broadband Internet access services” with the 1996 Act. See Op. 410-11. Barely more than a year after the 1996 Act, Congress charged the FCC with assessing “the definitions of ‘information service’ ... [and] ‘telecommunications service’ ” in the Act, and “the application of those definitions to mixed or hybrid services ... including with respect to Internet access.” See Dep’ts of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 623, 111 Stat. 2440, 2521 (1997). What is this but inquiring into “the regulatory status” of Internet access in the 1996 Act and whether Congress was satisfied with its scheme?
The Commission’s report, known as the Universal Service Report, made several conclusions confirming the text, history, and structure of the 1996 Act properly classified Internet access service as “information service.” See, e.g., Federal-State Joint Board on Universal Service, Report to Congress, FCC 98-67, 13 FCC Rcd. 11501, 11513-14 ¶ 27, 11536-40 ¶¶ 74-82 (1998) (hereinafter Universal Service Report). In this report, the FCC also endorsed the view of five Senators saying “[n]othing in the 1996 Act or its legislative history suggests [] Congress intended to alter the current classification of Internet and other information services or to expand traditional telephone regulation to new and advanced services.” Id. at 11520 ¶¶ 38-39. As the Senators’ view parallels the conclusions reached within the Universal Service Report, and their view is quite prescient, their letter is worth quoting at length:
This unparalleled success [in Internet access] has emerged in the context of policies that favor market forces over government regulation — promoting the growth of innovative, cost-effective, and diverse quality services. It is this same pro-competitive mandate that is at the heart of the 1996 Act.... Simply put, Congress has not required the FCC to prepare and submit a Report on Universal Service that alters this successful and historic policy. Moreover, were the FCC to reverse its prior conclusions and suddenly subject some or all informar tion service providers to telephone regulation, it seriously would chill the growth and development of advanced sciences to the detriment of our economic and educational well-being.
Some have argued Congress intended that the FCC’s implementing regulations be expanded to reclassify certain information service providers, specifically Internet Service Providers (ISPs), as telecommunications carriers. Rather than expand regulation to new service providers, a critical goal of the 1996 Act was to diminish regulatory burdens as competition grew. Significantly, this goal has been the springboard for sound telecommunications policy throughout the globe, and underscores U.S. leadership in this area. The FCC should not act to alter this approach.
Letter from Senators John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden to the Honorable William E. Kennard, Chairman, FCC (Received Mar. 23, 1998), http://apps.fcc.gov/ecfs/ document/view?id=2038710001 (emphasis added).
The FCC heeded the Universal Service Report’s, conclusions in subsequent Orders. In its Advanced Services Order, the FCC characterized the “last mile” of Digital Subscriber Line services (DSL services), *398 or “broadband Internet service furnished over telephone lines,” as a “telecommunications service.” See Verizon, 740 F.3d at 630-31 (citing In re Deployment of Wireline Services Offering Advanced Telecommunications Capability, 13 FCC Rcd. 24012, 24014 ¶ 3, 24029-30 ¶¶ 35-36 (1998) (“Advanced Services Order")). But, the Advanced Services Order specified the last-mile transmission between the end user and the Internet Service Provider is distinct from the “enhanced service” of Internet access itself. “The first service is a telecommunications service (e.g., the ... transmission path), and the second service is an information service, in this case Internet access.” See Advanced Services Order, 24030 ¶ 36.
In 2002, the FCC issued its Cable Broadband Order. The Commission found that cable modem service “supports such functions as email, newsgroups, maintenance of the user’s world wide web presence, and the DNS. Accordingly ... cable modem service” is “an Internet access service,” making it “an information service.” See Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities, FCC 02-77, 17 FCC Rcd. 4798, 4822 ¶ 38 (2002) {“Cable Broadband Order”). This classification stood irrespective of the fact that “cable modem service provides the [enhanced service] capabilities described [ ] via ‘telecommunications.’ ” Id. 4823 ¶ 39. In the case of cable modem service, “[t]he cable operator providing cable modem service over its own facilities ... is not offering telecommunications service to the end user, but rather is merely using telecommunications to provide end users with cable modem service.” Id. 4823-24 ¶ 41. The distinction between the services still stood, even as the nature of cable modem service rendered it an integrated “information service.” This confirms, again, what is of relevance here: the fact that an “information service,” like Internet access, has “telecommunications services” among its component parts does not per se make it a “telecommunications service.” The Cable Broadband Order was at issue in Brand X.

A.

Brand X
In Brand X, the Supreme Court left the FCC’s “information service” classification of cable-provided Internet access “unchallenged.” See 545 U.S. at 987-88, 125 S.Ct. 2688. Brand X also acknowledged, as FCC acknowledged in its prior Orders and in its briefing before the Brand X Court, “information service ... [is] the analog to enhanced service” in the 1996 Act, and this “information service” includes accessing the Internet. See 545 U.S. at 987, 125 S.Ct. 2688; see also FCC Brand X Reply Br. 5, No. 04-277 (Mar. 18, 2005) (explaining Internet access allows the user to “interact[ ] with stored data ... maintained on the facilities of the other ISP (namely the contents of ... web pages, e-mail boxes, etc.)”). When explaining why cable modem service was an “information service,” the Brand X Court relied on cable modem service “providing] consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications” — namely, “enabling users, for example, to browse the World Wide Web .... [to] mateh[ ] the Web page addresses that end users type into their browsers (or ‘click’ on) with the Internet Protocol (IP) addresses of the servers containing the Web pages the users wish to access.” Id. at 987, 125 S.Ct. 2688. Even as cable modem service relied on “telecommunications service” to bring this “information service” to the end user, *399 “the nature of the functions the end user is offered” was Internet access, an information service — rendering the classification proper. See id. at 988, 125 S.Ct. 2688 (emphasis added). The presumption here is, under the 1996 Act, Internet access is information service.
Brand X cannot be read to render broadband Internet access a “telecommunications service.” As the Supreme Court said, “the entire question [in Brand Z] is whether the products here are functionally integrated or functionally separate.” Id. at 991, 125 S.Ct. 2688 (emphasis added). In other words, does the fact that cable modem service delivers the “information service” of Internet access through a “telecommunications service” render the two services one “offer” of “information service?” Or, is there one “offer” of “telecommunications service” in the transmission and one “offer” of “information service” in the Internet access? To channel Justice Scalia’s Brand X pizzeria analogy, the Brand X majority found cable modem service a single “offer” of “information service,” or a pizzeria’s single “offer” of pizza and pizza delivery. Justice Scalia, in contrast, thought cable modem service contained “offers” of “telecommunications” and “information” services, respectively, or separate “offers” of “pizza delivery” and “pizza.” No member of the Brand X Court disputed that what occurred at the Internet Service Providers’ computer-processing facilities constituted an “information service.” See 545 U.S. at 997-1000, 125 S.Ct. 2688; see also id. at 1009-11, 125 S.Ct. 2688 (Scalia, J., dissenting). Or, continuing the analogy, no 'member of the Brand X Court disputed that the pizzeria makes pizza. FCC would confirm that nothing in Brand X rendered Internet access itself a “telecommunications service.” See Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities, et al., FCC 05-150, 20 FCC Rcd. 14853, 14862 ¶ 12 (2005) (“Internet access service is an information service”).

B.

Reclassification and Verizon
The FCC repeatedly affirmed the Act’s deregulatory approach toward mobile broadband Internet access as well. In 2007, the Commission said “mobile wireless broadband Internet access service does not fit within the definition of ‘commercial mobile service’ ” because it is not an “interconnected service” — it connects to the Internet and not the telephone network. See Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks, FCC 07-30, 22 FCC Rcd. 5901, 5916 ¶ 41, 5917 (2007).[2] The FCC reached the same conclusion in 2011. See Reexamination of Roaming Obligations of Commercial Mobile Radio Service Providers and Other Providers of Mobile Data Services, FCC 11-52, 26 FCC Rcd. 5411, 5431 ¶ 41 (2011). In doing so, the Commission confirmed mobile broadband’s status as outside common carrier classification.
This Court was equally consistent about the status of mobile broadband Internet service. In Cellco Partnership v. FCC, 700 *400 F.3d 534 (D.C. Cir. 2012), this Court said Section 332 provides a “statutory exclusion of mobile-internet providers from common carrier status.” See id. at 544. When the FCC attempted to treat mobile broadband like a common carrier in Verizon, this Court minced no words — -the “treatment of mobile broadband providers as common carriers would violate section 332.” 740 F.3d at 650.
To be sure, this Court said in Verizon that, under Section 706 of the 1996 Act, the FCC “never disclaimed authority to regulate the Internet or Internet providers altogether.” See id. at 638. Whatever the wisdom of Verizon’s interpretation of Section 706, the FCC did not “reclassify broadband” to implement “net neutrality” principles in that case. See id. at 633. In fact, as Judge Williams noted in dissent from the Court’s Opinion here, “the Verizon court struck down the rules at issue on the ground that they imposed common carrier duties on the broadband carriers, im-permissibly so” under the Act. See Concurring & Dissenting Op. 770 (emphasis in original); see also Verizon, 740 F.3d at 650 (“[R]egulating broadband providers as common carriers” would “obvious[ly] ... violate the Communications Act.”); see also id. at 656-59. Moreover, Verizon did not require the FCC to reclassify broadband in the future if the Commission wanted to implement any form of “net neutrality.” Instead, Verizon identified FCC authority in Section 706 to implement some “net neutrality” regulations without reclassification (such as FCC’s “transparency rules,” which the Verizon Court upheld). When crafting this Order, the Commission took note of Verizon’s conclusions.
In announcing the Order here, the FCC Chairman claimed the Order “proposed” to “reinstate rules that achieve the goals of the 2010 Order using the Section 706-based roadmap laid out by the court [in Verizon].” See Notice of Proposed Rulemaking, FCC 14-61, 29 FCC Rcd. 5561, 5647 (2014) (statement of Chairman Tom Wheeler). No statement from the FCC— until after the President intervened, that is — ever suggested the Commission felt compelled by Verizon to reclassify broadband if it wanted to implement any “net neutrality” principles. Indeed, when the Notice of Proposed Rulemaking explained the contours of the Order’s ban on commercially unreasonable practices, it stated the following as FCC’s goal: “[CJodifying an enforceable rule to protect the open Internet that is not common carriage per se.” See id. at 5599, Subpart III.E (capital-izations omitted) (emphasis added). The Notice of Proposed Rulemaking made similar statements with respect to its revisions to the “no-blocking” rule after Verizon. See id. at 5595 ¶ 95.
Verizon found the FCC’s proper Section 706 authority consistent with “the backdrop of the Commission’s long [regulatory] history.” See 740 F.3d at 638. That “backdrop” led Verizon to say: “Congress clearly contemplated that the Commission would continue regulating Internet providers in the manner it had previously.” Id. at 639. Before the President’s intervention in this Order and in light of Verizon, the Commission was going to do exactly that. But by reclassifying broadband Internet access as common carriage, “the circumstances” of this Order are “entirely different” from what Verizon considered. See id. at 638.
III.

The Order Here Lacks Congressional Authorization

The Order at issue gives FCC the authority to regulate “all users of public IP addresses,” or everything that connects to the Internet. See In the Matter of Protecting and Promoting the Open Internet *401 (“Order”) ¶ 396 (Feb. 26, 2015). By 2020, according to the FCC Chairman, this could amount to 50 billion interconnected devices. See, e.g., Remarks of FCC Chairman Tom Wheeler, International Institute of Communications Annual Conference (Oct. 7, 2015), https://apps.fcc.gov/edocs_public/ attachmatch/DOC-335877A1.pdf. This vast power comes from two different, but related statutory reclassifications. First, the FCC reclassifies fixed broadband Internet access from an “information service” under Title I of the Act to a “telecommunications service” under Title II. Second, the FCC reclassifies mobile broadband service as an “interconnected service” with “the public switched network” under Title III.
Both reclassifications ensure.what the Court calls “consistent regulatory treatment” of mobile and fixed broadband Internet access. See Op. 724. By “consistent regulatory treatment,” the Court means the FCC can treat Internet access like monopolist railroads and telephone services — as a common carrier subject to public utility regulation. The innovation of modern technology now falls prey to the regulatory labyrinth smothering the old.
Subjecting all broadband Internet access to common carrier regulation lets FCC decide how to apply onerous requirements on Internet access. This authority covers all the ways in which Internet Service Providers conduct and run their respective businesses. The Order gives the FCC authority to determine, case-by-case, whether any activities “unreasonably interfere with or unreasonably disadvantage the ability of consumers to reach the Internet content, services, and applications of their choosing.” Order ¶ 135. FCC is empowered to assess the “reasonableness” of all rates, terms, and practices of Internet Service Providers. See, e.g., id. ¶¶ 441-52, 512, 522. The Order also includes an outright ban on several practices, including: “throttling,” or slowing Internet service down, id. ¶ 119; blocking access to certain Internet content; and on individualized negotiation of Internet access between content owners and Internet Service Providers (called “paid prioritization”), id. ¶ 125. Some practices are explicitly left for the FCC to address in the future, like not charging end customers for the data used by certain applications or Internet services (“zero rating”), and sponsored-data plans, id. ¶¶ 151-53. In short, the Order establishes the FCC’s long-term authority over Internet access.
The FCC’s unheralded assertion of power has already led some smaller Internet Service Providers to “cut[ ] back on investments [in broadband Internet access].” See Statement of FCC Commissioner Ajit Pai On New Evidence That President Obama’s Plan To Regulate The Internet Harms Small Businesses And Rural Broadband Deployment (May 7, 2015), http://go.usa. gov/3wAkn. I doubt they will be the last Providers to lessen their investments in Internet access, or to attempt navigating their business practices around FCC regulation. The Court’s Opinion is blasé about grafting public utility regulation on to an innovative enterprise. See Op. 734. But, the conceit of regulatory capture is often fatal to growth, leading regulation to fail at its own aims by operating on only a pretense of knowledge. See F.A. Hayek, The Fatal Conceit: The Errors of Socialism 76 (W.W. Bartley, III ed. 1991) (“The curious task of economics is to demonstrate to men how little they really know about what they imagine they can design.”).
Reclassifying broadband Internet access so as to subject it to common carrier regulation upends the Act’s core distinction between “information service” and “telecommunications service,” and it rewrites the statutory prohibition on treating mobile broadband providers as common carri *402 ers. Distinguishing “enhanced service,” like Internet access, from “basic services” subjected to public utility regulation is not some trivial matter, nor is it resolved simply by whether Congress authorized FCC to have some degree of regulatory authority over the Internet. Drawing this distinction is “the essential characteristic” of the 1996 Act. Cf. MCI Telecomms. Corp., 512 U.S. at 231, 114 S.Ct. 2223. “What we have here, in reality, is a fundamental revision of the statute, changing it from a scheme of’ common carrier regulation for telecommunications services, to common carrier regulation of information service when that service merely has telecommunications services among its component parts. Cf. id. “That may be a good idea, but it was not the idea Congress enacted into law in 19[96].” See id. at 232, 114 S.Ct. 2223. Therein lies the problem.

A.

The Major Question Of Reclassification Requires Clear Congressional Authority

One might be tempted to say turning Internet access into a public utility is obviously a “major question” of deep economic and political significance — any other conclusion would fail the straight-face test. But, the Court exhibits no such qualms. See Op. 704-05. Of course, the Opinion does not — and cannot — dispute the FCC’s Order implicates a “major question.” Indeed, the Court has already characterized “net neutrality” regulation as a “major question,” even without the distinct salience brought by implementing “net neutrality” through reclassifying broadband Internet access. See Verizon, 740 F.3d at 634 (“Before beginning our analysis, we think it important to emphasize that ... the question of net neutrality implicates serious policy questions, which have engaged lawmakers, regulators, businesses, and other members of the public for years.... Regardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.”). The problem here is the Court’s analysis — it ignores the legal consequences flowing from the “major question” determination.
As Chief Justice John Marshall recognized long ago, there is a difference between “those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.” See Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825). Accordingly, the deference courts afford to administrative agencies under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) is “premised on the theory that a statute’s ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps.” FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citing Chevron, 467 U.S. at 844, 104 S.Ct. 2778); see also La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (holding the FCC has “literally ... no power to act ... unless and until Congress confers power upon it”). In other words, the mere existence of “a statutory ambiguity,” see Op. 704, “is not enough per se to warrant deference to the agency’s interpretation. The ambiguity must be such as to make it appear that Congress either explicitly or implicitly delegated authority to cure that ambiguity.” Am. Bar Ass’n v. Fed. Trade Comm’n, 430 F.3d 457, 469 (D.C. Cir. 2005); see also Brown & *403 Williamson, 529 U.S. at 133, 120 S.Ct. 1291 (requiring an agency to bear in mind “the fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme”).
An agency’s freedom to regulate on a matter via a statutory ambiguity therefore turns on what Congress authorized — and that latter determination is “shaped, at least in some measure, by the nature of the question presented.” See id. at 125, 120 S.Ct. 1291; see also Am. Bar Ass’n, 430 F.3d at 469. Is the agency regulating on a “major question” of deep economic and political significance, or is it regulating on an interstitial matter? If Congress is not going to leave “those important subjects” to “itself,” but instead authorize an agency to regulate on them, an implicit authorization is insufficient. “We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance.” Util. Air Regulatory Group v. EPA, — U.S. —, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (UARG); King v. Burwell, — U.S. —, 135 S.Ct. 2480, 2488-89, 192 L.Ed.2d 483 (2015) (“[H]ad Congress wished to assign that [extraordinary] question to an agency, it surely would have done so expressly;” requiring the Court to interpret the statute de novo for a clear statement of congressional authorization); Brown & Williamson, 529 U.S. at 160, 120 S.Ct. 1291 (authorizing an agency to regulate on a matter of “such economic and political significance” would not occur “in so cryptic a fashion”); Whitman v. Am. Trucking Ass’n, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (“Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does • not, one might say, hide elephants in mouseholes.”); MCI Telecomms. Corp., 512 U.S. at 231, 114 S.Ct. 2223 (“It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion — and even more unlikely that it would achieve that through such a subtle device as permission to ‘modify’ rate-filing requirements.”).
The Court fails to fairly engage this standard of review, both overrating the role of the statutory ambiguity here and underrating the application of the clear statement rule to major questions.[3] After jumping right into Chevron’s two-step deference analysis, the Court’s Opinion treats Brand X as the coup de grace for any requirement of clear congressional authorization. See Op. 701-05. Yes, Brand X did uphold the FCC’s determination that the “offering” of “telecommunications service” in Title II of the Communications Act is ambiguous. See 545 U.S. at 986, 989, 125 S.Ct. 2688. But this “statutory ambiguity” does not allow the FCC to reclassify broadband Internet access without any serious judicial scrutiny. But see Op. 704.
*404 The mere fact that a “statutory ambiguity” exists for some purposes does not mean it authorizes the agency to reach major questions — statutory context and the overall scheme must be considered. See, e.g., UARG, 134 S.Ct. at 2441 (“[WJhile Massachusetts rejected EPA’s categorical contention that greenhouse gases could not be ‘air pollutants’ for any purposes of the Act, it did not embrace EPA’s current, equally categorical position that greenhouse gases must be air pollutants for all purposes, regardless of the statutory context.”) (emphasis in original); Whitman, 531 U.S. at 469 n.1, 121 S.Ct. 903 (“None of the sections of the CAA in which the District of Columbia Circuit has found authority for the EPA to consider costs shares § 109(b)(l)’s prominence in the overall statutory scheme.”). When the statutory context and backdrop against which Congress passed the 1996 Act are considered, as they were in Brand X, the Supreme Court’s decision reinforces 'the need for FCC to show a textual assignment of authority before it can reclassify broadband Internet access as common carriage.
The Order posits — and the Court’s Opinion approves — an untenable reading of Brand X: the pizzeria no longer offers “pizza” or “pizza delivery,” it just offers “delivery.” In other words, because the “information service” of retrieving information from Internet websites includes “telecommunications service,” every aspect of that “information service” is now just a “telecommunications service.” See, e.g., Order ¶ 195. The Court tries to wave off this problem by quickly saying Brand X “focused on the nature of the functions broadband providers offered to end users, not the length of the transmission pathway” Op. 702. This is true, but it does nothing to support the Court’s position. As the history explained above reveals, “the nature of the functions broadband providers offered to end users” was the focus of Brand X because the Supreme Court did not challenge the fact that “enabling] users ... to browse the World Wide Web” is information service. See 545 U.S. at 987, 125 S.Ct. 2688. In response, the Court’s Opinion resorts to crying wolf — claiming a full reading of Brand X would “freeze in place the Commission’s existing classifications of various services,” which neither Congress nor Brand X intended. See Op. 703. But this misses the point. Yes, Brand X found the “offering” of “telecommunications service” ambiguous. And yes, Brand X allows FCC to assess the “factual particulars” of changed broadband technology. See 545 U.S. at 991, 125 S.Ct. 2688. But, nothing in Brand X renders the statutory term “information service” indistinguishable from “telecommunications service.” Computer processing at ISP facilities remains an “enhanced service” exempt from common carrier status under the statute. See 47 U.S.C. §§ 230(f)(2), 231(e)(4).
By incorporating FCC’s distinction between “enhanced service” and “basic service” into the statutory scheme, and by placing Internet access on the “enhanced service” side, Congress prohibited the FCC from construing the “offering” of “telecommunications service” to be the “information service” of Internet access. See Universal Service Report ¶ 39 (“After careful consideration of the statutory language and legislative history, we affirm our prior findings that telecommunications service and information service in the 1996 Act are mutually exclusive.”) (emphasis added); see also Sekhar v. United States, - U.S. -, 133 S.Ct. 2720, 2724, 186 L.Ed.2d 794 (2013) (“[I]f a word is obviously transplanted from another legal source ... it brings the old soil with it.”); see also Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (“Ambiguity is a creature not of definitional possibilities but of statutory context.”); cf. *405 Brown & Williamson, 529 U.S. at 144, 120 S.Ct. 1291 (“In adopting each statute, Congress has acted against the backdrop of FDA’s consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco.... ”). The issue therefore, is not whether FCC can assess technological changes to Internet access, or whether FCC has discretion to reasonably construe the “offer” of “telecommunications service” by considering that transmission part of the “information service” it transmits, or considering the transmission itself an “offer” of “telecommunications service” separate from the “information service” it transmits. Rather, the issue is whether FCC can use this discretion to transgress congressional distinctions and definitions — such as the distinction drawn between “Internet access service” and “telecommunications services,” see 47 U.S.C. § 231(e)(4), or the definition of “interactive computer services,” which “means any information service ... including specifically a service or system that provides access to the Internet,” id. § 230(f)(2) (emphasis added). Nothing, not even Chevron deference, makes “a statutory ambiguity,” see Op. 704, a tool to override congressional standards.
Congress has declined to authorize “net neutrality” legislation of any kind, let alone revisit its classification of Internet access as outside the realm of common carrier regulation. The FCC’s historic practice, taken together with Congress’s refusal to cede this authority, obligates us “to defer not to the agency’s expansive construction of the statute, but to Congresses] consistent judgment.” See Brown & Williamson, 529 U.S. at 160, 120 S.Ct. 1291.

B.

No Clear Congressional Authority To Reclassify

“Since an agency’s interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear, the Commission’s ... policy can be justified only if it makes a less than radical or fundamental change in the Act.... The Commission’s attempt to establish that no more than that is involved greatly understates the extent to which its policy deviates from the [Act’s] require-mentfs], and greatly undervalues the importance of the [Act’s] requirement[s].” MCI Telecomms. Corp., 512 U.S. at 229, 114 S.Ct. 2223; see also UARG, 134 S.Ct. at 2442 (“Thus, an agency interpretation that is inconsistent] with the design and structure of the statute as a whole ... does not merit deference.”).
Perhaps this explains why the Court’s Opinion foregoes a statutory analysis. On issue after issue, the Court puts agency ipse dixit where reasoned analysis should be:
First, as to the 1996 Act’s policy statements, the Court simply parrots the Commission’s speculation that it is “unlikely [ ] Congress would attempt to settle the regulatory status of broadband Internet access services in such an oblique and indirect manner, especially given the opportunity to do so when it adopted the Telecommunications Act of 1996.” See Op. 702-03. But the clear statement rule requires reading the statute, not nodding along with the agency. Broadband Internet access may be more sophisticated than Internet access from the 1990s, but this does not change the nature of broadband Internet access. Cf. Brand X, 545 U.S. at 992, 125 S.Ct. 2688 (“In any event, we doubt that a statute that, for example, subjected offerors of ‘delivery’ service (such as Federal Express and United Parcel Service) to common-carrier regulation would unambiguously require pizza-delivery companies to offer their delivery services on a common earri *406 er basis [too].”)-[4] The Act’s policy statements are fulfilled in specific statutory provisions, but the Court’s Opinion ignores them.
Second, the Court’s Opinion makes mincemeat of Verizon and sends the Universal Service Report silently into the night. The Order here claims the Universal Service Report was “not a binding Commission order.” Order ¶ 315. This is as inexplicable as it is unexplained. The Order provides no principled reason why the Universal Service Report — a report of FCC Commissioners to Congress — should be dismissed, nor why the FCC’s repeated citation to the Universal Service Report in prior Orders should be ignored. The Court is silent on this issue, and its assessment of Verizon is revisionist history. It claims FCC “did not believe” Verizon left it with any choice but to reclassify broadband Internet access as a “telecommunications service” if it wished to implement “net neutrality” principles. See Op. 707. But as Verizon’s upholding of FCC’s transparency rules, the statements from FCC Chairman Wheeler, and this Order’s Notice of Proposed Rulemaking together confirm, this is false. The FCC identified a path to implement some “net neutrality” regulation without reclassification. The Court just ignores it.
Third, the Court nonsensically permits mobile broadband’s reclassification by embracing the Order’s redefinition of “the public switched network.” The Court’s Opinion, like the Order, redefines “the public switched network” to “encompass devices using both IP addresses and telephone numbers.” See Op. 719. Since mobile broadband Internet access allows users to access Voice-over-Internet-Protocol (“VoIP”) applications (such as Skype), the Court concludes mobile broadband “gives subscribers the capability to communicate to telephone users.” See id. at 719. But the backdrop against which Congress enacted the 1996 Act confirms the FCC never defined “the public switched network” to mean anything other or beyond the telephone network, and certainly not public IP addresses.[5] Indeed, Congress itself distinguished “the public switched network” and the Internet. When Congress passed the Spectrum Act of 2012, it distinguished “connectivity” to “the public Internet” from “connectivity” to “the public switched network.” See 47 U.S.C. § 1422(b)(1). This subsequent, specific distinction can inform *407 what “the public switched network” meant to Congress in 1996. See Brown & Williamson, 529 U.S. at 133, 120 S.Ct. 1291 (“[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand.”). The Court has no basis to claim it is “counter-textual” to equate “the public switched network” with “the public switched telephone network.” See Op. 718 (emphasis omitted). Not even the Court can claim VoIP services make mobile broadband and the telephone network a single network. See id. at 719 (“[T]he VoIP service sends the call from her tablet’s IP address over the mobile' broadband network to connect to the telephone network and, ultimately, to her friend’s home phone.”) (emphasis added). Nothing about the increase of consumers accessing mobile broadband Internet service via smart phones, see id. at 719-20, the speed of Internet connection, id. at 720, or the “bundling” of VoIP applications with smart phones, id. at 720-21, undermines the FCC’s 2007 distinction between the transmission of VoIP traffic and the VoIP service to the end user. Mobile broadband Internet access simply does not constitute a service interconnected with “the public switched network.”
Fourth, the Court lets FCC get away with satisfying none of the statutory requirements to forbear common carriage regulation. The judiciary should take care to ensure the Commission rigorously applies these standards in accordance with' the 1996 Act’s overall scheme. Even as forbearance is designed to further freedom in the 1996 Act, giving an agency power to eviscerate statutory requirements is “astonishing even by administrative standards.” See Phillip Hamburger, Is Administrative Law Unlawful? 121 (2014). Under our Constitution, “[t]here is no provision ... that authorizes the President [or any executive agency] to enact, to amend, or to repeal statutes.” Clinton v. City of New York, 524 U.S. 417, 438, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998).[6]
“[T]he power to enact statutes may only be exercised in accord with a single, finely wrought and exhaustively considered, procedure.” Id. at 439-440, 118 S.Ct. 2091. This power is intrinsically legislative; it cannot be delegated away from the legislature. When Congress has delegated authority allowing the “suspension” or “repeal” of statutory provisions, “Congress *408 itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President,” or in this case, the FCC. See id. at 445, 118 S.Ct. 2091 (emphasis added). In other words, only Congress may alter statutory standards^ — an agency or the President is left simply to make factual findings about whether those legal standards should apply-
Yet, as Judge Williams noted in his opinion here, “the Commission’s massive forbearance [came] without findings that the forbearance is justified” under the statute’s conditions. See Concurring & Dissenting Op. 775; see also id. at 775-78. Both the FCC and the Court found reclassifying Internet access as a “telecommunications service,” coupled with forbearance, would be within FCC’s power even without a change in the underlying factual circumstances of Internet access. See Order ¶ 360 n.993; Op. 706. In other words, the Court concludes the FCC’s forbearance need not have anything to do with factual findings — the Commission is free to rewrite statutory terms as it sees fit. Used in this way, forbearance usurps the exclusively-legislative function of lawmaking because, “[i]n both legal and practical effect, the [FCC] has amended [an] Act[ ] of Congress by repealing [or amending] a portion.” See Clinton, 524 U.S. at 438, 118 S.Ct. 2091; see also UARG, 134 S.Ct. at 2446 n.8 (I am “aware of no principle of administrative law that would allow an agency to rewrite such [] clear statutory term[s], and [I] shudder to contemplate the effect that such a principle w[ill] have on democratic governance”).
Troubling as the failure to follow the Act’s requirements is, that is not the FCC’s only abuse. It also used forbearance to pervert the Act’s requirements.

C.

Perversion Of Forbearance Authority

FCC’s use of its forbearance authority confirms this Order is “an enormous and transformative expansion [of its] regulatory authority without clear congressional authorization” and, thus, “unreasonable.” UARG, 134 S.Ct. at 2444 n.8. By the FCC Chairman’s own admission, the Act’s common earner regulations do not contemplate broadband Internet access. So, the Order cannot merely reclassify broadband Internet access, it must also “modernize Title II, tailoring it for the 21st century.” Tom Wheeler, FCC Chairman Tom Wheeler: This is How We Will Ensure Net Neutrality, Wired (Feb. 4, 2015, 11:00 AM), https://www.wired.com/2015/02/fccchairman-wheeler-net-neutrality/. As the Chairman conceded, this required “taking the legal construct that once was used for phone companies and pairing it back to modernize it.” FCC Proposes Treating All Internet Traffic Equally, PBS NewsHour (PBS television broadcast Feb. 4, 2015, 6:35 PM), http://www.pbs.org/newshour/bb/ fcc-proposes-treating-all-internet-traffic-equally.
The Order acknowledges its tailoring of the Act’s common carrier requirements so as to capture broadband Internet access is “extensive,” “broad,” “[a]typieal,” and “expansive” — including at least 30 Title II provisions and 700 rules promulgated under them. See Order ¶¶ 37, 51, 438, 461, 493, 508, 512, 514. The Order also says this level of forbearance results in a modernization of Title II “never” before contemplated. See id. ¶¶ 37, 38. The Court’s Opinion and the Order disregard the nature of forbearance.
*409 Forbearance permits the FCC to reduce common carriage regulation over telecommunications, not expand common carriage regulation by reclassifying an information service and shaping common carriage regulations around it. The FCC has consistently understood this, invoking forbearance toward one of “Congress’s primary aims in the 1996 Act:” “deregulate telecommunications markets to the extent possible.” See, e.g., Memorandum Op. & Order, Petition of Qwest Corp. for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metro. Statistical Area, 20 FCC Rcd. 19415, 19454 (2005); see also Petition of ACS of Anchorage, Inc. Pursuant to Section 10 of the Commc’ns Act of 1934, as Amended, for Forbearance from Sections 251(c)(3) & 252(d)(1) in the Anchorage Study Area, 22 FCC Rcd. 1958, 1969 ¶ 16 (2007) (referring to the “deregu-latory aims” of FCC’s statutory forbearance authority). The Court, however, makes an argument foreign to the 1996 Act. The Opinion claims “the rapid deployment of new telecommunications technologies” “might occasion the promulgation of additional regulation.” Op. 734. Congress, however, clearly did not consider the 1996 Act’s goals — promoting competition and reducing regulation — in tension with “the rapid deployment of new telecommunications technologies.” Rather, the Act’s obvious reading is that more competition and lower regulation would lead to increased deployment of new telecommunications technologies. The ensuing history of Internet innovation vindicated Congress’s policy choice. Understanding the expansion of common carrier regulation as an affirmative good, as the Court seems to do, is foreign to the Act.
There is a sad irony here. Both this Court and the Supreme Court admonished the FCC for asserting forbearance authority without congressional authorization when the Commission’s aim was deregula-tory. Now, when the Commission’s aim is to increase regulation, this Court is willing to bless the Commission using forbearance without any satisfaction of the statutory requirements, and at odds with the nature of forbearance itself.
UARG cited generally-applicable tenets of administrative law and the separation of powers — not some Clean Air Act novelty— when it said “[a]n agency has no power to ‘tailor’ legislation to bureaucratic policy goals by rewriting unambiguous statutory terms.” 134 S.Ct. at 2445. The Court blithely ignores its “severe blow to the Constitution’s separation of powers” by reading the FCC’s forbearance authority to expand, rather than lessen, common carrier regulation at the legislature’s expense. See id. at 2446. The Court provides no answer to the problems of public accountability and individual liberty with its mere assertion of forbearance being a “statutory mandate.” Compare Op. 706 with Clinton, 524 U.S. at 451-52, 118 S.Ct. 2091 (Kennedy, J., concurring). If the FCC is to possess statutory forbearance authority, it should conform to forbearance’s statutory conditions and the overall statutory scheme. Neither is the case here. The FCC’s abuse of forbearance amounts to rewriting the 1996 Act in the bowels of the administrative state, when it should petition Congress for these purportedly-necessary changes.
IV.

Presidential Interference

When all the statutory somersaults, revisionist history, and judicial abdication are done, we are still left with a lingering question: Why, on the verge of announcing a new Open Internet Order in 2014 that both implemented “net neutrality” principles and preserved broadband Internet access as an “information service,” would the *410 FCC instead reclassify broadband Internet access as a public utility? Simple. President Obama pressured the FCC to do it. This Court once held “an agency may not repudiate precedent simply to conform with a shifting political mood.” Nat’l Black Media Coal. v. FCC, 775 F.2d 342, 356 n.17 (D.C. Cir. 1985). Alas, here we see the exception that kills the rule.
The FCC released its Notice of Proposed Rulemaking in May of 2014 — where it was clear that broadband Internet would not be reclassified for common carrier regulation. Afterward, “an unusual, secretive effort” began “inside the White House” with activists interested in getting the FCC to change its position. See G. Nagesh & B. Mullins, Net Neutrality: How White House Thwarted FCC Chief, Wall St. J. (Feb. 4, 2015). White House staffers were directed “not to discuss the process openly.” Id. One can see why — the FCC is, after all, supposed to be independent from Presidential control. See, e.g., Humphrey’s Ex’r v. United States, 295 U.S. 602, 624-26, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).
In addition to the White House’s private meetings, the President issued an online video (from China, without any irony) urging the subjugation of broadband Internet access to common carrier regulation. See G. Nagesh & B. Mullins, Net Neutrality: How White House Thwarted FCC Chief, Wall St. J. (Feb. 4, 2015); see also The President’s Message On Net Neutrality (Nov. 10, 2014), https://www.whitehouse. gov/net-neutrality (“To put these protections in place, I am asking the FCC to reclassify Internet service under Title II of a law known as the Telecommunications Act.”). In the President’s written statement, he said this reclassification should be facilitated by “at the same time forbearing from rate regulation and other provisions less relevant to broadband services.” Id.
The President’s statements “stunned officials at the FCC;” “the statement[s] boxed in [the FCC Chairman] by giving the FCC’s two other Democratic commissioners cover to vote against anything falling short of [the President’s] position.” G. Nagesh & B. Mullins, Net Neutrality: How White House Thwarted FCC Chief, Wall St. J. (Feb. 4, 2015). Moreover, President Obama’s statements were issued “outside of the window that the FCC had set for public comments,” but the FCC accepted them anyway. See Kathryn A. Watts, Controlling Presidential Control, 114 Mich. L. Rev. 683, 741 (2016); see also The Path To A Free And Open Internet, https://www.whitehouse.gov/net-neutrality (identifying in a timeline that “[t]he FCC’s comment period c[ame] to a close” on September 15, 2014, but “President Obama call[ed] on the FCC to take up the strongest possible rules to protect net neutrality” on November 10, 2014).
The President’s efforts “essentially killed the compromise” of “net neutrality” without reclassification. G. Nagesh & B. Mullins, Net Neutrality: How White House Thwarted FCC Chief, Wall St. J. (Feb. 4, 2015). The FCC Chairman promptly delayed release of the new Order to consider the President’s position. See FCC Chairman Tom Wheeler’s Statement on President Barack Obama’s Statement Regarding Open Internet (Nov. 10, 2014), https://apps.fcc.gov/edocs_public/ attachmatch/DOC-330414A1.pdf. “On February 26, 2015, the FCC voted 3-2 along party lines to regulate broadband Internet service as a public utility under Title II of the Communications Act, thus voting for net neutrality rules aligned with [President] Obama’s own-plan.” Watts, Controlling Presidential Control, 114 Mich. L. Rev. at 741.
There is a wide spectrum of agreement that the President’s intervention into the *411 FCC’s deliberations was, with respect to broadband’s reclassification, outcome determinative. This spectrum includes a former Special Assistant to President Obama and current “net neutrality” advocate. See Susan Crawford, A Tale of Two Commissioners, BackChannel (May 26, 2015), https://backchannel.com/how-the-fcc-found-its-backbone-960331bfac95#.s1rj231ui (“[T]he FCC, although an independent agency, can read the President’s speeches like everyone else, sense the change in the wind, and act accordingly.”). It includes a dissenting FCC Commissioner. See Order (dissenting statement of Commissioner Ajit Pai) (“So why is the FCC changing course? Why is the FCC turning its back on Internet freedom? Is it because we now have evidence that the Internet is not open? No. Is it because we have discovered some problem with our prior interpretation of the law? No. We are flip-flopping for one reason and one reason alone. President Obama told us to do so.”). It includes a Report from the Majority Staff of the Senate Committee on Homeland Security and Governmental Affairs, which investigated the White House’s involvement in the FCC’s deliberations. See Majority Staff Report, Committee on Homeland Security and Governmental Affairs (Ron Johnson, Chairman), Regulating The Internet: How The White House Bowled Over FCC Independence, *2 (Feb. 29, 2016) http://Avww.hsgac.senate.gov/ download/regulating-the-internet-how-the-white-house-bowled-over-fcc-independence (citing internal FCC correspondence to conclude, the “influence [of President Obama] was disproportionate relative to the comments of members of the public,” and that his involvement created a “pause” Avithin the FCC’s deliberations so to build a legal argument for reclassification). It also includes law professors ultimately sympathetic Avith the President’s intervention. See, e.g., Watts, Controlling Presidential Control, 114 Mich. L. Rev. at 719 (“Pai is clearly correct that President Obama played a key causal role in the FCC’s shift in its approach and ultimate decision to reclassify broadband.”).
Despite President Obama’s “key causal role” behind the FCC’s reclassification flip, his involvement goes virtually unmentioned in the Order. In the course of the Order’s hundreds of pages and more than a thousand footnotes, there is one, indirect, reference to President Obama’s advocacy, buried in the middle of a footnote. See Order ¶ 416 n. 1223 (quoting a letter asking whether “the President’s push for Title II reclassification would affect” a company’s broadband investments). Despite the FCC’s dearth of reference to the President’s involvement, two footnotes Avithin the Order contain citations to sources characterizing the approach the FCC would ultimately take toward “net neutrality” as President Obama’s “plan.” See Order ¶ 40 n. 35, ¶ 416 n. 1220.
The President’s conduct — and the involvement of White House staff more generally — raise questions about the form and substance of executive Power. Unfortunately, none of these questions were addressed by the Court. Given the salience of these questions to our Constitution’s separation of powers, this Court owed the American people a legal analysis, not silent obedience.

A.

A Double Standard

The questions of form raised by the President’s involvement concern the rule-making procedures designed to ensure public accountability — namely, the FCC’s regulations on ex parte communications and adherence to notice and comment requirements. To be sure, rulemaking is not a “rarified technocratic process, unaffected *412 by political considerations or the presence of Presidential power.” Sierra Club v. Costle, 657 F.2d 298, 408 (D.C. Cir. 1981). And, as we have held, “the need for disclosing ex parte conversations in some settings do[es] not require that courts know the details of every White House contact. ...” See id. at 407. The FCC, however, has its own rules regarding ex parte contacts, and the White House would be aware of them.
The Order’s. Notice of Proposed Rule-making referred to and detailed some of the FCC’s ex parte requirements. See Notice of Proposed Rulemaking 5624-25 ¶ 181 (citing, inter alia, FCC’s ex parte rules, at 47 C.F.R. §§ 1.1200 et seq.). FCC Chairman Wheeler said the Commission would “incorporate the President’s submission into the record of the Open Internet Proceeding,” FCC Chairman Tom Wheeler’s Statement on President Barack Obama’s Statement Regarding Open Internet (Nov. 10, 2014), https://apps.fcc.gov/edocs_ public/attachmateh/DOC-330414A1.pdf. But, neither the Chairman’s statement nor the Order explain why the President was allowed to make his submission after the comment period expired. See Watts, Controlling Presidential Control, 114 Mich. L. Rev. at 741. Nor does the Commission ever explain why further public comment was not solicited after the President intervened — despite the Chairman stating he welcomed further comment. The Order’s record does not establish whether the communications between White House staffers and the FCC satisfied the Commission’s regulations on ex parte communications (or why these communications were exempt from these rules). See Majority Staff Report, Committee on Homeland Security and Governmental Affairs (Ron Johnson, Chairman), Regulating The Internet: How The White House Bowled Over FCC Independence, *25 (Feb. 29, 2016) http://www.hsgac.senate.gov/ download/regulating-the-internet-how-the-white-house-bowled-over-fcc-independence (“The documents reviewed by the Committee make clear that Chairman Wheeler regularly communicated with presidential advisors. None of the communications reviewed by the Committee were submitted to the FCC’s formal record in the form of ex parte notices although the [Open Internet] Order was clearly discussed.”). The White House had reason to know of its obligations under the FCC’s ex parte rules. See, e.g., Memorandum from Deputy Assistant Attorney Gen. John O. McGinnis to the Deputy Counsel to President George H. W. Bush, 15 Op. O.L.C. 1, 1 (Jan. 14, 1991) (assessing the propriety of ex parte communications between White House officials and the FCC, concluding that “communications by the White House must be disclosed in the FCC rulemaking record if they are of substantial significance and clearly intended to affect the ultimate decision”) (emphasis added). In short, the Order and its administrative record leave us with many questions about the involvement of the President and his staff — questions made significant by us knowing enough to know that the President’s involvement was outcome determinative.
Perhaps the involved parties thought the President’s public advocacy of “net neutrality” through reclassifying broadband Internet access provided sufficient accountability; excusing the White House from following the FCC’s rules. Perhaps the FCC paid no mind to the matter because of the many filed comments endorsing some form of “net neutrality” regulation during the comment period. Whatever the thinking, this course “effectively created two very different proceedings: First there was the FCC’s conventional notice- and-comment proceeding replete with its formalized procedures and deadlines re *413 garding the submission of comments and ex parte contacts. Next emerged a different, more real-world proceeding,” the one where the President provided outcome-determinative influence. See Watts, Controlling Presidential Control, 114 Mich. L. Rev. at 741. This “leav[es] the notice-and-comment proceeding and the political proceeding disconnected from one another and mak[es] the notice-and-comment process look like no more than a smokescreen.” See id. Rules are only for Americans who lack friends in high places.
To be clear, I am not suggesting the President has no legitimate means of interjecting himself into an agency’s rulemak-ing process. Nor am I suggesting that the President should not bring an independent agency’s executive actions within the Executive Branch. See Free Enter. Fund. v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 499, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (“One can have a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts. Our Constitution was adopted to enable the people to govern themselves, through their elected leaders. The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive’s control, and thus from that of the people.”). Rather, my assertion follows from the nature of executive Power.
Executive Branch authority over the execution and enforcement of existing law is, in part, meant to ensure our government’s republican form — thereby remaining publicly accountable. Some Presidents, in the name of shaping an agency’s direction, “might accept a novel practice that violates Article II,” but “ ‘the separation of powers does not depend on the views of individual Presidents....’” PHH Corp., 839 F.3d at 35 (quoting Free Enterprise Fund, 561 U.S. at 497, 130 S.Ct. 3138). The Constitution’s structural features are, themselves, legal procedures designed to safeguard liberty by preserving public accountability against the current moment’s political priorities. A President may attempt to shape an agency’s deliberations so as to vindicate the Constitution’s structural allocation of power; ensuring the exercise of executive Power is consistent with the publicly-accountable executive. See, e.g., Costle, 657 F.2d at 405 (“The executive power under our Constitution, after all, is not shared[;] it rests exclusively with the President.... [T]he Founders chose to risk the potential for tyranny inherent in placing power in one person, in order to gain the advantages of accountability fixed on a single source.”). But if the means by which the President seeks to shape the agency’s deliberations transgress legal procedures designed to ensure public accountability — • like notice-and-comment requirements and rules regarding ex parte communications— he undermines the accountability rationale for confining executive Power to the President. Cf. Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2332 (2001) (characterizing “the degree to which the public can understand the sources and levers of bureaucratic action” as a “fundamental precondition of accountability in administration”). Acting with concern for public accountability seems especially salient when the President “and his White House staff’ seek to exert influence over the direction of an ostensibly-independent agency. Cf. Costle, 657 F.2d at 405-06 (“In the particular case of EPA, Presidential authority is clear since it has never been considered an ‘independent agency,’ but always part of the Executive Branch.”). Perchance something else explains the White House’s conduct here than attempting to confine the exercise of executive Power to the President. But, rather than *414 acknowledge the double standard the President’s involvement created between the American People and their Chief Executive, the FCC opted for the silent treatment. This Court has no such luxury. “[S]ome might think that judges should simply defer to the elected branches’ design of the administrative state. But that hands-off attitude would flout a long, long line of Supreme Court precedent.” PHH Corp., 839 F.3d at 35. Unfortunately, under this Court’s Opinion, the American People will never know quite how the government came to regulate their Internet access so pervasively.

B.

Reclassification Is Not A “Faithful” Execution Of Existing Law

The questions of substance regarding the President’s involvement here go to the core of our Constitution’s separation of executive and legislative Power..
The nature of executive Power differs depending upon whether the President is executing law, or seeking a change in existing law. In the former context, the President is required to “faithfully” execute the law. See U.S. Const. Art. II, § 3, cl. 5;[7] see also Robert G. Natelson, The Original Meaning of the Constitution’s “Executive Vesting Clause,” 31 Whitt. L. Rev. 1, 14 & n.59 (2009) (discussing Article II’s Take Care Clause as a “power-conferring” text historically “reminiscent” of “royal instructions” to act as an agent). “In the framework of our Constitution, the President’s power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.” Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); United States v. Midwest Oil Co., 236 U.S. 459, 505, 35 S.Ct. 309, 59 L.Ed. 673 (1915) (“The Constitution does not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts.”). The lawmaking power belongs exclusively to Congress, not to agencies. See City of Arlington, 133 S.Ct. at 1873 n.4. When the President petitions Congress to change the law, however, he, necessarily, need not advocate a position “faithful” to existing law. See U.S. Const. Art. II, § 3, cl. 2 (authorizing the President to “recommend such measures as he shall judge necessary and expedient”).
To be sure, the creation of agency rules can muddle these distinct aspects of executive Power. “Because most regulatory statutes have multiple goals and are not written with crystal clarity, the agency often has considerable interpretational leeway before it steps over the statutory line, and the President may' attempt to push the agency as close to that line as possible.” Thomas O. McGarity, Presidential Control of Regulatory Agency Decisionmaking, 36 Am. U.L. Rev. 443, 454 (1987). Our Constitution ensures that the line remains, however. Cf. The Federalist No. 73 (Hamilton), p. 441 (Clinton Rossiter ed., 1961) (adhering to the separation of powers avoids “the legislative and executive powers ... eom[ing] to be blended in the same hands”). “An activist President with control over the rulemaking process could use his power to press agencies beyond statutory limits that he was unable to persuade Congress to remove. Such a President would be guilty of unfaithful execution of the laws.” McGarity, Presidential Control *415 of Regulatory Agency Decisionmaking, 36 Am. U.L. Rev. at 455. A “related problem” “occurs when members of the President’s staff attempt to implement their own policy agendas in the name of the President.” See id. Given the outcome-determinative nature of the President’s involvement on the reclassification of broadband Internet access — and the clarity with which Congress set forth its deregulatory policy and standards in the 1996 Act — the question of how the President upheld his Take Care Clause obligation in urging the FCC to reclassify Internet access arises.
Here, the President did not ask the FCC to enforce “a congressional policy ... in a manner prescribed by Congress;” instead, he called on FCC to “execute” a “presidential policy” preference on net neutrality “in a manner prescribed by the President.” Youngstown, 343 U.S. at 588, 72 S.Ct. 863. The President did not ask Congress to reclassify broadband Internet access as a “telecommunications service” and implement “net neutrality” through public utility regulation. Rather, the President urged the FCC to reject Congress’s deregulatory aims and its classification of Internet access to further his preferred approach to “net neutrality.” As explained above, the classification of Internet access as “information service” is a core feature of the 1996 Act. The use of forbearance to lessen, rather than expand common carrier regulation, and the prohibition on treating mobile broadband Internet access as common carriage are all part of the 1996 Act’s deregulatory text, history, and structure. Nevertheless, the President sought to change this law not by petitioning Congress, but by influencing the FCC’s deliberations over how to enforce existing law. The President’s conduct collapsed the distinction between his constitutional authority to seek changes. in the law from the legislature, and his constitutional obligation to faithfully execute the law passed by Congress when interacting with the agency charged with executing the law.
The President’s obligation to “faithfully” execute existing law limits the realm of reasonable constructions he can provide to those charged with enforcing existing law. For example, during the “Quasi War” with France, Congress passed a statute permitting the seizure of any U.S. ship bound for France or its dependent powers. When President Adams sent the statute to the military for execution, he reinterpreted the statute — allowing for the seizure of any U.S. ship going “to or from Fr[e]nch ports.” See Little v. Barreme, 6 U.S. (2 Cranch) 170, 178, 2 L.Ed. 243 (1804) (emphasis added). The Supreme Court affirmed the Circuit Court’s finding that the seizure of a U.S. ship from French-controlled Haiti (then Jérémie) to Danish-controlled St. Thomas was invalid. Writing for the Court, Chief Justice Marshall said it did not matter that the President’s construction was motivated by it being “obvious!] that if only vessels sailing to a French port could be seized on the high seas that the law would very often be evaded.” Id. Congress, the Marshall Court said, “prescribed [ ] the manner in which this law shall be carried into execution,” and that “was to exclude a seizure of any vessel not bound to a French port.” Id. at 177-78. President Adams, however, gave it a “different construction,” id. at 178, one at odds with what Congress passed in both the statute’s “general clause” stating its purpose and the statute’s more specific limitations, id. at 177-78.
Similarly here,[8] the President urged the FCC to adopt a construction of Internet *416 classification at odds with both the “general clause[s]” of the 1996 Act’s deregulatory policy and the statute’s more specific definitions of “interactive computer service,” “information service,” “Internet access service,” “interconnected service,” and “the public switched network.” No doubt the President thought reclassifying broadband Internet access better captured the on-the-ground realities of Internet access. But, as in Bárreme, Congress “prescribed [ ] the manner in which this law shall be carried into execution,” and the President is limited to urging the execution of existing law with legal constructions that faithfully execute what Congress enacted. See id. at 177-78. As Justice Jackson famously put it, “[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb.” Youngstown, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring).
The President’s intervention did not result from a “failure of Congress to legislate” on the issue of Internet access regulation, but because he desired “a different and inconsistent way of his own” respecting that regulation. See id. at 639, 72 S.Ct. 863 (Jackson, J., concurring). The fact that Congress has, up until now, decided not to revise its 1996 Act with legislation amenable to President Obama’s view of Internet regulation does not mean Congress has “failed” to act. Congress “acted” with respect to the classification of Internet access service in 1996 — if President Obama thought a reclassification was needed, then Congress was the place to go. See, e.g., id. at 603, 72 S.Ct. 863 (Frankfurter, J., concurring) (explaining that, five years before President Truman’s steel seizure, “Congress said to the President, You may not seize. Please report to us and ask for seizure power if you think it is needed in a specific situation.’ ”). Nothing about our Constitution’s deliberative legislative structure is meant to facilitate a one-way ratchet in the President’s favor. See id. at 604, 72 S.Ct. 863 (Frankfurter, J., concurring) (“The need for new legislation does not enact it. Nor does it repeal or amend existing law.”); The Federalist No. 73 (Hamilton) p. 442 (Clinton Rosseiter ed., 1961) (“It may perhaps be said that the power of preventing bad laws includes that of preventing good ones.... But this objection will have little weight with those who can properly estimate the mischiefs of that inconstancy and mutability in the laws.... They will consider every institution calculated to ... keep things in the same state in which they happen to be at any given period as much more likely to do good than harm.”). Nor does the Constitution give the President an “I’m-frustrated-with-democracy” exception to Bicameralism and Presentment; allowing him to petition the FCC, rather than Congress, for a change in existing law. See NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 2567, 189 L.Ed.2d 538 (2014) (“It should go without saying ... that political opposition in the Senate would not qualify as an unusual circumstance” allowing the Presi *417 dent to disregard constitutional limitations).
“With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.... [I]t is the duty of the Court to be last, not first, to give [these institutions] up.” Youngstown, 343 U.S. at 655, 72 S.Ct. 863 (Jackson, J., concurring). This issue deserved much more scrutiny than the silence given to it by this Court.
y.
This Order shows signs of a government having grown beyond the consent of the governed: the collapsing respect for Bicameralism and Presentment; the administrative state shoehorning major questions into long-extant statutory provisions without congressional authorization; a preference for rent-seeking over liberty. This Court had an opportunity to see the wisdom of the “Man Controlling Trade” statue on Constitution Avenue, but we are no longer on the Constitution’s path. Hopefully, there is a clearer view of the road back to a government of limited, enumerated power from One First Street in our Capital City. In that hope, I respectfully dissent from the Court’s denial of rehearing en banc.

. The Judges concurring in today’s denial of rehearing note "[t]he [FCC] will soon consider adopting a Notice of Proposed Rulemaking that would replace the existing rule with a markedly different one.” Concurral at 382. For this reason, they consider en banc review "particularly unwarranted at this point.” Id. Of course, en banc review is not now at issue. The motions to rehear this case were filed in August of last year when rehearing would certainly have been appropriate. Moreover, regardless of any future FCC action, the broad implications of this Court's Panel Opinion remain; Supreme Court involvement may yet be warranted.

. Importantly, one of the reasons the FCC saw no sense in classifying mobile broadband as "commercial mobile service” is the "internal contradiction within the statutory scheme” doing so would create with the status of Internet access as an information service. See 22 FCC Rcd. at 5916 ¶ 41 ("Concluding that mobile wireless broadband Internet access service ... should not be ... subject to ... common carrier obligations ... is most consistent with Congressional intent to maintain a regime in which information service providers are not subject to Title II regulations as common carriers.”) (emphasis added).

. Unfortunately, cavalier treatment of the clear statement requirement for major questions is not unprecedented. When Verizon admitted "net neutrality'' implicated a major question, it quoted Brown & Williamson s standard of review (though, perhaps to avoid facing the clear statement rule head on, Verizon chose to quote a case quoting Brown & Williamson, not Brown & Williamson itself). Compare Verizon, 740 F.3d at 634 ("Regardless of how serious the problem an administrative agency seeks to address, ... it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.”) with Brown & Williamson, 529 U.S. at 125, 120 S.Ct. 1291. But then, Verizon did not apply the clear statement analysis, see 740 F.3d at 634, concluding instead that the case "is a far cry” from Brown & Williamson, despite its supporting quotation. See id. at 638.

. Nor, incidentally, does the Act's exclusion from "information service” those services that are "the management, control, or operation of a telecommunications system or the management of a telecommunications [purpose]” provide the Court or the Commission any assistance. See 47 U.S.C. § 153(24). A contrary conclusion would mean that Congress in 1996 considered Internet access, and all its computer-processing functions, a "basic service,” able to be provided by the Bell System companies. There is no evidence of that in the Act, FCC’s longstanding practice, or in Brand X.

. Time and again leading up to the Telecommunications Act of 1996, the FCC equated "the public switched network” with the telephone network. This was the case in 1981. See Applications of Winter Park Tel. Co., Mem. Op. and Order, 84 FCC 2d 689, 690 ¶ 2 n.3 (1981). This Court said the same in 1982. See Ad Hoc Telecomms. Users Comm. v. FCC, 680 F.2d 790, 793 (D.C. Cir. 1982). This equation provided a key premise to the FCC’s cell service policy in 1992. See Amendment of Part 22 of the Commission's Rules Relating to License Renewals in the Domestic Public Cellular Radio Telecommunications Service, FCC 91-400, 7 FCC Rcd. 719, 720 ¶ 9 (1992). Indeed, the calls to expand “the public switched network” to include the “network of networks,” cited in the current Order, were rejected by FCC in 1994. Compare Implementation of Sections 3(n) and 332 of the Communications Act; Regulatory Treatment of Mobile Services, FCC 94-31, 9 FCC Rcd. 1411, 1433-34 ¶ 53, 1436-37 ¶ 59 (1994) with Order ¶ 396 n. 1145.

. The FCC’s rulemaking here may “take [a] ‘legislative’ ... form[ ], but [it] [is] [an] exercise[ ] of — indeed under our constitutional structure [it] must be [an] exercisef] of — the 'executive Power.' ” See City of Arlington v. FCC, — U.S. —, 133 S.Ct. 1863, 1873 n.4, 185 L.Ed.2d 941 (2013) (emphasis in original); FCC v. Fox TV Stations, Inc., 556 U.S. 502, 524-25, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) ("In [Justice Stevens’] judgment, the FCC is better viewed as an agent of Congress than as part of the Executive.... Leaving aside the unconstitutionality of a scheme giving the power to enforce laws to agents of Congress, it seems to us that Justice [Stevens’] conclusion does not follow from his premise.”) (emphasis added); see also 47 U.S.C. § 151 (creating the FCC to "execute and enforce the provisions of this [Act]’’). Moreover, there is an argument that, though a nominally independent agency, the FCC, as a general matter, should be treated like an executive agency because Congress never created a for-cause removal statute prohibiting "the President [from] supervis[ing], directing], and removing] at will the” FCC Commissioners. See PHH Corp. v. Consumer Fin. Prot. Bureau, 839 F.3d 1, 18 n.4 (D.C. Cir. 2016). "We need not tackle that question in this case,” however, id., because the rulemaking exercised here facilitates a change in the execution and enforcement of the Act — this must be executive Power, see City of Arlington, 133 S.Ct. at 1873 n.4; Fox TV Stations, 556 U.S. at 525, 129 S.Ct. 1800 ("The Administrative Procedure Act, after all, does not apply to Congress and its agencies,” only to executive agency action).

. The President’s obligation under the Take Care Clause does not extend to laws the President considers unconstitutional, nor does it prohibit prosecutorial discretion. But, otherwise, "the Executive has to follow and comply with laws regulating the executive branch.” See Brett M. Kavanaugh, Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution, 89 Notre Dame L. Rev. 1907, 1911 (2014).

. That the military is under the President’s command and the FCC is an independent agency is of no moment here. The issue here is not the scope of the President's authority to *416 enforce the law (i.e., the extent to which the President can "direct” the FCC to act). Rather, the issue here is the nature of the authority the President exercises when seeking to change the enforcement of existing law. Enforcement authority cannot be conflated with the President’s separate and distinct ability to petition for changes in existing law itself. Nevertheless, as explained above, that is what the President attempted. It is no answer to say the President's action is not subject to judicial direction. See Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 499, 18 L.Ed. 437 (1866). I do not dispute that the Court cannot issue an order directing the President's "exercise of judgment” in law enforcement. See id. What is within this Court’s determination, however, is whether the Order at issue faithfully executes existing law. It does not, and it does not because of the construction set forth by the President.